```
 1                    IN THE UNITED STATES DISTRICT COURT
                      IN AND FOR THE DISTRICT OF DELAWARE
 2
                                    -  -  -
 3
      CNH AMERICA LLC and BLUE LEAF        )     Civil Action
 4    I.P., INC.,                          )
                                           )
 5               Plaintiffs,               )
                                           )
 6         v.                              )
                                           )
 7    KINZE MANUFACTURING, INC.,           )
                                           )
 8               Defendants.               )     No. 08-945-GMS

 9                                  -  -  -
                               Wilmington, Delaware
10                          Wednesday, January 3, 2011
                                   9:30 a.m.
11                            PRETRIAL CONFERENCE
                                    -  -  -
12

13    BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

14    APPEARANCES:

15              FREDERICK L. COTTRELL, III, ESQ., and
                CHAD M. SHANDLER, ESQ.
16              Richards, Layton & Finger
                       -and-
17              MARK BOLAND, ESQ.,
                JOHN B. SCHERLING, ESQ. (La Jolla, CA), and
18              RAJA N. SALIBA, ESQ.
                Sughrue Mion PLLC
19              (Washington, D.C.)

20                              Counsel for Plaintiffs

21              RICHARD L. HORWITZ, ESQ.
                Potter Anderson & Corroon, LLP
22                     -and-
                MARK L. DURBIN, ESQ., ESQ.,
23              PETER N. MOORE, ESQ., and
                WILLIAM WARD, ESQ.
24              Wildman, Harrold, Allen & Dixon LLP
                (Chicago, IL)
25
                                Counsel for Defendant
```

1              THE COURT:  Good morning.  Please be seated.

2      This is an office conference.  As such, we will dispense

3      with the formalities of Court, counsel.

4              So, Mr. Cottrell.

5              MR. COTTRELL:  Good morning, Your Honor.  Fred

6      Cottrell for the plaintiffs, my partner Chad Shandler.  With

7      me at counsel table Mark Boland, Raja Saliba, and John

8      Scherling from Sughrue Mion.  And, Your Honor, in-house

9      counsel from CNH, in the first row, Emily Lawrence and Mike

10     Harms (phonetic), Your Honor.

11             Thank you.

12             THE COURT:  Good morning.

13             MR. HORWITZ:  Good morning, Your Honor.  With me

14     at counsel table today, Mark Durbin on the end, Peter Moore,

15     and William Ward, all from Wildman Harrold.  And then in the

16     back, Brian Callen (phonetic), chief operating officer of

17     Kinze, and also Christine Clifford, who is a paralegal with

18     Wildman Harrold.

19             THE COURT:  Welcome.  Frankly, I am always glad

20     to see clients show up at these things.  I think it makes a

21     ton of sense.

22             Let me just give you an outline of how I intend

23     to proceed.  The first order of business will be your

24     various motions in limine, which, by the way, have inspired

25     me.  It's a new year, I think it's time for some new

procedures around here.  You can report to your Delaware

counsel, gentlemen, I am going to start reducing the number

of permissible motions in limine to two a side.  I may come

to eventually eliminate them, as does Judge Robinson.  They

take up an inordinate amount of time toward, in my judgment,

with all respect, not a whole lot of good result.  We will

talk about them nonetheless here today, however.

That will be forthcoming, for Delaware counsel's

information.

We will talk about the motions in limine.

Hopefully, I will be able to rule on each of them.  To the

extent that I am unable to do that because I feel

uncomfortable and feel that additional thought and/or

process is necessary, we will do that, and I will issue a

writing of some sort, usually a very short writing,

disposing of the motion.

Then after that, it's pretty much with me a

stream-of-consciousness affair.  I have a number of items

tabbed in your proposed pretrial order.

These are my law clerk and his successor, who,

fortunately, is able to be here today, she will pick up this

matter with me, and so we will have a nice transition.

Mr. Scherer and Ms. Sullivan Editor in Chief of

the Villanova Law Review, and another very distinguished

soon-to-be young lawyer on his way to the Sixth Circuit

1    Court of Appeals after he leaves me.

2              We will go through the tabbed items.  I don't

3    think there is any controversy in the preliminary

4    instructions, as I recall.  I am going to have a suggestion

5    for you with regard to the use of the video, rather than

6    having me do an oral recitation of the constitutional basis

7    of patents and all of that.  We can talk about that.

8              We are not going to do final jury instructions

9    today, nor will we address the competing verdict forms or

10   the differing views on the verdict form.

11             We will do that later on.

12             I will go through some general nudges that I

13   have, some do's and don'ts.  Then I will open the floor,

14   beginning with plaintiff, for discussion of the various

15   items you might have on your mind.

16             That is how we will proceed.

17             I will probably just alternate on the motions in

18   limine.  It has been several days since I read these, so you

19   will have to forgive me if my recollection suffers a bit.

20             I am, as a housekeeping matter, in receipt of

21   your filing, and it's fine, wherein you propose an amendment

22   to the proposed pretrial order having to do with exhibits.

23   It's filed at -- anyway, I will approve the amendment -- was

24   this ECF-filed?

25             MR. COTTRELL:  Last night, Your Honor.  We

1    didn't have a chance to send it over last night, so we

2    brought it over this morning.

3                THE COURT:  Ms. Walker will take care of

4    whatever she does.

5                MR. HORWITZ:  Your Honor, on those documents, I

6    think we had an agreement that there were some designations

7    that they put in that document.  As long as it is okay with

8    the Court, we still have to put in objections to some

9    designations.

10                THE COURT:  Okay.  Do you want us to hold up on

11    this?

12                MR. HORWITZ:  I think it's okay, either way.

13                THE COURT:  I am just concerned, as I would

14    imagine you are, about the preservation of your objections,

15    to the extent you need to do that.

16                MR. DURBIN:  Just with the holidays and the

17    pretrial, we were focusing on this.  It won't take us long.

18    Early next week.

19                THE COURT:  Do you want to do another filing,

20    which is more complete and comprehensive?  That is fine.

21                MR. DURBIN:  That would be great.  Thank you so

22    much.

23                THE COURT:  Any objection?

24                MR. COTTRELL:  No objection.

25                THE COURT:  Do you want to just withdraw this?

1    It would probably be easier administratively.

2              MR. DURBIN:  Sure.

3              THE COURT:  And re-file it with the completed

4    objections and whatever else needs to be attended.  I will

5    treat it as a motion.  It's approved.

6              I had a note to myself, and I have designated

7    Plaintiffs' Motion in Limine No. 1, which seeks to exclude

8    evidence of Krause "Two-Hole Seed Cup Because It is Not

9    Prior Art."  I made a note to myself, for some reason, I

10   don't recall exactly, that it might be appropriate to

11   discuss this with Defendant's No. 3.

12             Does that resonate with anyone out there?

13             MR. DURBIN:  Yes, Judge.  Defendant's No. 3

14   relates to the issue of corroboration or the effort to swear

15   behind Krause No. 2.  I think that's probably why the Court

16   saw that.  Krause No. 2, the plaintiffs were seeking to

17   exclude, in our motion, which is related to No. 3.  We ask

18   that the Court limit the suggestion of the invention date

19   prior to April 25th of 1996.  They both do relate to the

20   Krause --

21             THE COURT:  So Defense No. 3 really relates to

22   Plaintiffs' No. 2, not Plaintiffs' No. 1.

23             MR. DURBIN:  I am sorry.

24             MR. BOLAND:  Your Honor, if I may.  We think

25   they are separate.  And we think they can just briefly be

1    addressed serially.

2              THE COURT:  That is fine.  I had made that

3    notation.  I couldn't remember quite why I made it.

4              MR. BOLAND:  There are some issues that are

5    intertwined, but the precise relief being sought in each is

6    quite separate.

7              THE COURT:  Let me just take a look.

8              So, counsel, are you going to handle this?

9              MR. BOLAND:  Yes, I will take No. 1.

10             THE COURT:  So you will know and have some

11   preview of what my thinking was at the time that I read

12   this, the brief note I wrote was, It seems to me this is a

13   question of fact for the jury, an objection that can be

14   renewed later if there is an appropriate basis.  That is

15   where you are going.

16             MR. BOLAND:  Your Honor, in a typical case where

17   a defendant is trying to prove up something as prior art, it

18   usually is an issue for the jury.  What we have here from

19   this Krause Company are several items that the defendants

20   are offering.  One of them is this particular two-hole

21   device.  And Krause started with a one-hole device that had

22   a different structure, and it did not have a cutout in the

23   bottom.  It operated the way it did.  We are going to

24   contend it didn't work very well.

25             So Mr. Fink, the one engineer from Krause from

1       whom there is testimony so far in this case, and the only

2       one on the witness list, and he is the only one we have, he

3       says in early '96 the two-hole meter was put on these grain

4       drills that were sold to customers.  We don't dispute that

5       grain drills were sold to customers in early '96.  Our

6       filing date is August of '96.  We don't dispute that.  But

7       there is not a single document that shows what type of seed

8       cup or seed meter was placed on those early '96 grain

9       drills.  All we have is Mr. Fink's testimony.  And he said

10      that.  I asked him point-blank in his deposition:

11              Can you point to a single document, sir, that

12          shows whether these particular grain drills from early

13          '96 had the two-hole or something else?

14              And he said no.

15              And so we asked, All we have is your word, sir?

16              He said, Yes, that's correct.

17              The quotes are in our brief, Your Honor.

18              Where does that leave us?

19              We have some circumstantial evidence.  We have

20      some engineering drawings he did prior to this early '96

21      time frame.  They are confidential.  There is even a tooling

22      quote.  They got a quote to see how much it would cost to

23      change the tooling to go to the other model.  But that's not

24      evidence of what was on the machine.  So from what was on

25      the machine itself, all we have is his word.

1          Couple that with the public documents at the

2     time.  We cited DX-503 and 504.  One is a January '96

3     owner's manual.  It still shows the one-hole.  And one is

4     from much later in '96, I think it's from November, and it

5     shows the one-hole.

6          So the only documents available to the public,

7     Your Honor, in 1996 that are in the record disclose the

8     one-hole device.  All we have is Mr. Fink's testimony that

9     the two-hole device was used.

10         THE COURT:  Which is uncorroborated, in your

11    view.

12         MR. BOLAND:  Yes.  That is exactly the precise

13    point that requires corroboration.  The Finnigan case, the

14    Federal Circuit case, went on a long explanation of

15    corroboration, and you are familiar with the rule of reason,

16    of course.  If the question is, does it apply when you have

17    a single person from the public, regardless of his or her

18    level of interest, testifying that a patent is invalid, the

19    Federal Circuit said, without any doubt, yes, corroboration

20    is required.

21         So the defendants cite a case, Thompson, that

22    was distinguished by the Finnigan Court.  And defendants

23    say, well, no corroboration is required.  We totally

24    disagree.

25         Finnigan addressed the precise issue here of

1    public use by a third party.

2              Your Honor, we submit that Mr. Fink's testimony

3    as a matter of law can't be corroborated on the record going

4    to trial.  That is the only issue we are asking for here,

5    Your Honor.  If the Court will agree with us, then the

6    two-hole can't come in as prior art.  And where you have a

7    single person's testimony, and so he is put to the test of

8    corroboration, we respectfully submit that the documentary

9    trail needs to be entirely consistent.  And here what we

10   pointed out in our brief it is not.

11             What you have is the public documents at the

12   time showing the old design.  All we have is his word, his

13   spoken word that the two-hole was used.

14             What we also have, Your Honor, is he changed his

15   testimony from an affidavit filed earlier in the case.  In

16   the PI phase, the Court will recall, we brought a PI

17   motion --

18             THE COURT:  I won't recall.  So go ahead.

19             MR. BOLAND:  We brought a PI motion, and it was

20   denied.  One of the issues that the defendants raised was

21   this Krause seed meter as prior art.  They put in an

22   affidavit from Mr. Fink.  Mr. Fink said, Oh, here is a clear

23   model of this two-hole seed meter.  This was made in late

24   1995.

25             In cross-examination, when we later took

1    discovery in the fact discovery phase of the case, we said,

2    When was this made?  Where are the documents?

3                   I don't have any.

4                   When was it made?  You can't point to any

5    particular document that shows when this clear plastic model

6    was made?

7                   No, I can't.

8                   And he says now, Well, I think it was most

9    likely in the '96 time frame.

10                   So he has backed off of the '95 date.  He is now

11    saying probably '96.  Your Honor, that is not clear and

12    convincing evidence.

13                   So we are moving to exclude that clear plastic

14    model.  There is no clear and convincing evidence in the

15    record whatsoever that it would qualify as prior art.

16                   So, Your Honor, in a nutshell, that is the basis

17    for our Motion No. 1.  It is a fairly narrow issue.  We are

18    not saying that in a normal case issues of proving up prior

19    art by clear and convincing evidence don't go to the jury.

20    We are saying here, as a matter of law, there is one

21    person's testimony on the critical issue, the model is

22    undated, and there is inconsistent corroborated evidence, if

23    any.

24                   Thank you.

25                   THE COURT:  What happened to the model that you

1    just mentioned?

2            MR. BOLAND:  Kinze has put in photographs of

3    this model they obtained from Krause.  At some point in time

4    Krause did go to this two-hole design.  I don't know exactly

5    when because it is not in the record, and it couldn't be

6    determined through discovery.

7            At some point they made a model.  Instead of

8    being, I think, black plastic, which was their early

9    commercial version of the one-hole, this clear model was

10   intended to show customers at some point how it worked.  But

11   it's not dated.

12           Jumping ahead to one of our other motions, our

13   position is, in general, if Kinze comes in with models or

14   physical devices that haven't been dated, they are not

15   admissible as prior art.  They are just not prior art.  So

16   they are not relevant.

17           MR. DURBIN:  Thank you, Judge.

18           We have a different view.  We do think this is a

19   factual issue.  Obviously, the determination of whether it

20   does qualify as prior art is a determination that will be

21   made ultimately by the jury.  We believe they are asking the

22   Court to make that determination on their view of the

23   record, which we disagree with.

24           THE COURT:  Could you just focus on the argument

25   he is making with regard to corroboration.

1          MR. DURBIN:  If I may, Judge.  That is exactly

2     where I am going.  That is what I mean by the incomplete

3     description of the record.  The evidence shows this.

4          Mr. Fink worked for a company called Krause.

5     Krause developed a seed meter that had one hole.  It was

6     called the one-hole.  And they sold a few of those.  In

7     August of 1995 -- it is Exhibit B to our motion -- in fact,

8     I have separate copies.

9          THE COURT:  I have it.

10         MR. DURBIN:  That one is blown up so you can see

11    the date.

12         THE COURT:  Counsel, so you will know that my

13    statement with regard to having read your briefs some time

14    ago is not my effort to -- you shouldn't conclude from that

15    that I haven't read the briefs.  I have.  It's simply that

16    in the course of events I read them some time ago.  You may

17    have to refresh my recollection.

18         MR. DURBIN:  Fair enough, Judge.  I think it's

19    complicated, given the divergence we have between what the

20    factual record is.

21         Exhibit B is a design drawing that shows the

22    two-hole seed pattern.  It is dated on the front page August

23    14 of 1995.

24         THE COURT:  I am looking for the date, counsel.

25         MR. DURBIN:  It is in the lower right corner.

1          THE COURT:  Yes.

2          MR. DURBIN:  Mr. Fink testified this is the

3    drawing.  By this time in August of '95 they had invented it

4    and they had drawn it up and they were beginning the process

5    of manufacturing it.

6          What we put to you next, Judge, which is Exhibit

7    C, is the actual -- Mr. Fink testified to this -- is the

8    purchase requisition.  It is a collection of documents, the

9    purchase requisition to have the tooling made to build the

10   two-hole seed cup.  You will see it is August 29th of 1995.

11   Within that package, which you will also see, if you go, for

12   example, to the page with Krause 213 on the bottom, Judge,

13   you will see that is actually the requisition that preceded

14   the purchase order from Allied Tool for the quote to change

15   the parts.  Then the purchase order was issued.

16          On the next page, you see an August 30th date

17   from Acutek.  This is the quote to actually make the parts,

18   not just the tooling, but to make the parts.  Again, this is

19   August 30 of 1995.  You have the purchase order on the next

20   page to begin the parts on August 30th of 1995.  Then after

21   that you have some additional work orders relating to the

22   development of the parts.  In fact, Judge, you also have, I

23   think this is valuable, a description, if I could take you

24   back to the Allied Tool requisition quotation, on Page 213,

25   they describe delivery of these tools in approximately 13 to

1    15 weeks, August of '95, which takes us into what Mr. Fink

2    testified to, the beginning of '96.

3              Then he testified -- if you will go to Exhibit

4    D, these are actual sales records of the Krause planters

5    with the seed cups -- he testified that they sold six of

6    them with the one-hole cup listed on this, then starting at

7    the seventh one, which is March 29 of 1996, those all had

8    the two-hole cup.  All of that is perfectly consistent with

9    his testimony that they invented it prior to August, they

10   issued a requisition -- they asked for quotations, they

11   issued purchase orders.  They made the tooling.  They made

12   the parts.  Then they were for sale.

13             It is not unsupported, as suggested.  At a

14   minimum, we have met the standard required to get this to

15   the jury, Judge.

16             THE COURT:  It seems to me, counsel for

17   plaintiff, Mr. Boland, as is often the case, facts are in

18   the eye of the beholder.  In this case it would be the jury,

19   it seems to me.  Given that recitation, now my recollection

20   is refreshed why was I not correct in my initial assessment

21   announced that this is really a question for the jury, and

22   that should it come to pass that you wish to interpose an

23   additional objection, you would be given leave to do that

24   and we could discuss it at sidebar, should it come to pass

25   that there is not sufficient evidence, either direct and/or

```
 1    circumstantial, from which to conclude that indeed this is

 2    prior art.  In other words, I am not prepared to accept the

 3    view of counsel making attorney arguments, albeit, never

 4    mind how well made, that may lead me into preempting the

 5    fact-finder's role.  It seems to me to be improvident and

 6    imprudent.

 7              I am going to deny the motion.

 8              MR. BOLAND:  Thank you, Your Honor.  Could I ask

 9    for clarification?

10              THE COURT:  What clarification do you need?

11              MR. BOLAND:  With respect to the clear model

12    itself?

13              THE COURT:  It's not just the model, counsel.

14    It's everything -- it may be perhaps other things that have

15    been referenced just now by your opponent.  Clearly, these

16    are marked exhibits in the case.  You will have a chance to

17    cross-examine this gentleman, Mr. Fink I think it is.

18              MR. BOLAND:  Thank you, Your Honor.

19              THE COURT:  Should you establish it is not as a

20    matter of law prior art because there is no corroboration,

21    you will move at sidebar and I will rule.

22              MR. BOLAND:  Thank you.

23              THE COURT:  That is denied.

24              Let's go to Defendant's No. 1.

25              I think it was my impression at the time that
```

1    this was actually a couple of motions in one.  Not true?  I

2    thought I recognized a Part A and a Part B.  We are talking

3    about the entire market value rule.

4             MR. DURBIN:  Judge, what we have done is we have

5    identified general clauses with the entire analysis and talk

6    about a specific subclause, including the entire market

7    value rule.

8             THE COURT:  Bear with me a second, counsel.

9             MR. DURBIN:  And a couple others.

10            THE COURT:  I will tell you, Mr. Durbin, the

11   shoe is now on the other foot, as it were.  It again strikes

12   me, this is a matter better left to the jury's consideration

13   and not one in which the Court should impose its will and

14   judgment preemptively.  Go ahead.

15            MR. DURBIN:  So, Judge, the attacks have a

16   couple different levels.  I will focus on the specific ones,

17   starting with the general description of a lack of a

18   baseline, no real approach.

19            Let me focus specifically on the entire market

20   value rule first, and a couple of specific points that need

21   to be addressed.

22            We don't think the testimony should come in at

23   all.  But with respect to the entire market value rule,

24   unlike the issue where the jury might -- this is one of

25   those things, using referencing, if I can reference the

 1    Unilok versus Microsoft case, they talked about the entire

 2    market rule and they used the phrase it was improper to let

 3    it in because once the cat is out of the bag you can't put

 4    it back in.

 5              THE COURT:  Did they say why you can't put it

 6    back in?

 7              MR. DURBIN:  Yes.  Because the numbers become so

 8    big, once the jury has heard this large amount of revenue,

 9    this large amount of profit, you can't unring the bell.

10              THE COURT:  Can the judge unring the bell?

11              MR. DURBIN:  The judge tried and they said it

12    wasn't good enough.  What happened in that case is exactly

13    what we are saying here.  We have said that Mr. Napper, as a

14    requirement, he is the expert, to use the entire market

15    value rule, had to reach the conclusion, based on sufficient

16    evidence, that the basis for customer demand of the entire

17    plant -- keep in mind, Judge, the planter is as big as this

18    room.  It has a huge tool bar.  It's got drives, mechanisms,

19    roll units, wheels.  And there is a seed meter that is one

20    part of each row unit.  And the patent relates to one part

21    of the seed meter which is part of a roll unit which is part

22    of a planter.  And they kept ten percent on the whole thing.

23    And we said you can't do that until you provide, as was said

24    in <u>Lucent</u> and said again yesterday, until you provide and

25    prove --

```
 1                    THE COURT:  Can you give me the cite?

 2                    MR. DURBIN:  I will go to the website.  The slip

 3       opinion --

 4                    THE COURT:  We will go on the website.

 5                    MR. DURBIN:  As the Court said, you have to

 6       establish first, before you can talk about this, that the

 7       basis for that entire planter is, in fact, the patented

 8       feature.

 9                    So at his deposition, and he should not be

10       allowed to contradict this, I asked Mr. Napper whether he

11       had reached the conclusion that customer demand was, in

12       fact, because of the patented features.

13                    THE COURT:  Let me ask you this, counsel:  Is it

14       the case that he shouldn't be allowed to contradict it or

15       that you can attack any effort by him to contradict his

16       testimony?

17                    MR. DURBIN:  I would submit to you, Judge, that

18       his analysis is, one, flawed because he had to reach his

19       conclusion before he could do his analysis.  And he

20       testified -- I said:  Did you reach a conclusion as to

21            whether or not the patented functionality in this case

22            is the reason that people are buying EdgeVac planters?

23                    Answer:  I didn't reach that conclusion.  We

24            discussed this before.  I reached the conclusion that

25            based upon what I understand to be the patented
```

1          functionalities described to me by their technical

2          expert, Dr. Kaufman, the benefits of those patented

3          functionalities and linking those benefits to

4          essentially the proper placement of seed in the

5          ground, spacing between the seeds as they are placed

6          in the    ground, and how relevant that is to farmers

7          or customers making the purchase decision on the

8          accused planters.  I am not sure what that means, but

9          I do know what the first sentence means.  I didn't

10         reach that conclusion.

11              So his analysis is flawed.  And I can't unring

12     the bell once he gets up and puts in this ten-percent

13     number.  There is no way.  He didn't do an analysis.  There

14     is no other analysis.  The actual license agreements

15     relevant to this are on a per-meter basis, a buck a meter

16     for prior improvements.

17              He didn't do the analysis.  He didn't do an

18     analysis based on the revenue related to just the seed

19     meters, didn't do an analysis.  All he did was, he took the

20     biggest platform he could find and he did an analysis

21     without reaching the conclusion required by Federal Circuit

22     precedent.

23              So I would suggest that the analysis is flawed,

24     and should not be allowed, and you can't unring the bell.

25              That is Point No. 1.

1            The second point I want to address is, again,

2    the way he approached the analysis.  In this case, from the

3    beginning, or toward the end of the fall phase, at the

4    preliminary injunction phase, the Court rejected the

5    preliminary injunction and found there were substantial

6    issues of infringement and invalidity.  None of those claims

7    are in the case here.  But in the interim, there were from

8    12 to 280 claims.  At the time of the expert reports -- and

9    we are going to be talking about them here today -- there

10    were 280 asserted claims.

11            We asked the plaintiff to reduce the number.

12    They refused.  We encouraged the Court to encourage them to

13    reduce the number.  You said, I can't make you drop a claim,

14    but you guys should think about.  In response, they said, we

15    will tell you when, but we will tell you after the experts

16    are done.

17            That is important to a lot of the discussions.

18            What Mr. Napper did, even though he was under

19    their control and could have known what they were actually

20    going to assert, now it's 16, but it's actually 35 because

21    of the dependent chain, so 35 we are fighting about now.  He

22    didn't evaluate any single claim, any single feature.  He

23    took the entire 280 claims.  He evaluated the whole

24    subdivision.  He said all 280 are with ten percent of the

25    entire planter.

1          And I said, well, you understand there might be

2     found infringement of a valid claim of only one or a few of

3     those?  He said yes.  We said, did you do any analysis as to

4     any subset, any individual claim?  No.

5          Now, Judge, as we sit here today, the only

6     opinion he can offer is that all 280 claims are worth ten

7     percent.  But those claims are not even at issue anymore.

8     We only have the claims that are being asserted.

9          In response, the plaintiffs have said all the

10    features are basically the same.  Let me stop and say, first

11    of all, that could create some validity issues.  But most

12    importantly, he didn't offer that opinion.  He didn't do

13    that analysis.  He cannot take that stand and say they are

14    all the same.  He didn't do it.  Huge flaw, cannot be

15    corrected.  And I think he should be barred for that reason

16    as well.

17         The last specific thing I need to raise with

18    you, Judge, is he has done three different numbers.  He has

19    done an analysis of damages from when the patents, roughly

20    when they were issued, from when the reexam certificates

21    were issued and from when the lawsuit was filed.  He did it

22    when the lawsuit was filed because in this case it is

23    undisputed, Judge, they didn't mark.  They did not mark.

24         So we have said he should not, as I said, you

25    can't unring the bell, he shouldn't be able to double the

1   damages and later on the Court say you got to cut that in

2   half, you may have already heard that big number, he has

3   already moved the chains as soon as he says that.  He should

4   not be allowed to talk about that.

5          We think at a minimum those three things should

6   be barred.  But effectively we think the best thing to do is

7   knock out his opinion.  There is one other thing he did.  I

8   mentioned that the X rule license opinions in the case were

9   typically on a per-seed-meter basis.  There was one for a

10  tool bar that was about one percent, and he opined ten

11  percent.  Actually, he originally opined 15 percent.  After

12  we pointed out some math errors, he dropped it to ten

13  percent.  There is nothing that is even close to that, that

14  actual license agreement between an interparty license

15  agreement for 1500 patents, including these for four

16  percent.  But he said ten percent.  And the only thing he

17  could find to support that was a reference to the testimony

18  in a prior lawsuit between these two parties about a

19  different patent, different technology, and he relied on

20  that as his ten-percent number.  We don't think he should be

21  allowed to talk about that, either, for a couple reasons.

22  It is just confusing.  We would have to re-try the damages

23  in that case.

24          MR. SCHERLING:  Your Honor, John Scherling for

25  Kinze on this matter.

1          With respect to the entire market value rule

2     here, the evidence in the case, we put it in our case, it is

3     in our papers, from Mr. Napper's report and his disposition,

4     is that the meter in this case, the seed meters are critical

5     to the functioning of the planter.  There is evidence that

6     Mr. Napper --

7               THE COURT:  Could you address the quote?

8               MR. SCHERLING:  I will get there, Your Honor.

9               THE COURT:  You might want to get there now.

10              MR. SCHERLING:  With respect to that quote that

11    Mr. Napper did not reach that conclusion, Mr. Napper was

12    referring to the conclusion the way Mr. Durbin phrased it in

13    that question.  And Mr. Napper understood it to be more of a

14    direct one-step analysis, whereas Mr. Napper actually looked

15    at this in more of a two-step analysis, where first he is

16    looking at the benefits of the technology, the benefits of

17    the seed meters, and linking that to proper seed spacing.

18    Then he is looking at what is important to the farmers and

19    what is relevant to the farmers in making their decisions to

20    purchase planters.  And accurate seed spacing is what is

21    important to the farmers in purchasing the planters.

22              So I think you can't just view that one question

23    and answer in isolation there, because if you look at

24    earlier in the deposition, as Mr. Durbin quoted, Mr. Napper

25    started out by saying, You have already covered this.

```
 1              If you go back earlier in the deposition, that

 2    was in our papers, at Page 236 of the deposition, Mr. Napper

 3    clearly stated that the use of the patented functionality is

 4    the basis for a demand for the whole planter.

 5              He said that in his deposition, that that is

 6    implicit throughout.

 7              THE COURT:  Let me stop you right there, because

 8    I want to get a reaction to that.

 9              MR. DURBIN:  I disagree.  I believe that those

10    questions were not as specific as this question.  Frankly,

11    Judge, I was confused.  I thought for him to have done this

12    analysis he must have reached the conclusion that these

13    things were on the basis for demand.  If you follow -- I

14    hate to go backwards -- but beginning this chain of

15    questioning that is allegedly out of context, I said:

16              Isn't part of the analysis, when you consider

17          lost profits, to determine whether or not the patented

18          component is the reason people are buying the overall

19          device when you seek a royalty on the whole thing?

20              I said, Strike that.

21              I said, You understand that when you did your

22          analysis, you had to reach a conclusion as to whether

23          or not the reason people buy EdgeVac planters is

24          because of the patented functionality that was at

25          suit.  Right?  You had to reach a conclusion as to
```

1      whether or not that was what was motivating them to

2      buy?

3           Page 253 of the deposition.

4           Answer -- interesting here:  You would expect

5      him to say yes, and I did.  Here is what he said:

6           Answer:  I had to review information that would

7      suggest that one of a bases for demand of a customer

8      or farmer making a purchase decision for the accused

9      vacuum seed meter planters of Kinze was the proper

10     placement of seed in the ground in terms of spacing,

11     and that that has some bearing or relationship with

12     the patented functionality at issue in order for me to

13     determine -- just like Mr. Hoffman, from the last

14     litigation, did in that case -- that the appropriate

15     royalty base is the planter.

16          And I followed up and I said:

17          Did you reach a conclusion as to whether or not

18     the patented functionality in this case is the reason

19     that people are buying EdgeVac planters?

20          Answer:  I didn't reach that conclusion.  This

21     is where we started.  It couldn't be clearer.

22          Let me clarify this.  This is not about the

23     meter.  This is not about -- I think they say in the briefs,

24     the meter is the heart of the planter.  Under the patents,

25     we can have a meter.  We can have a vacuum meter.  He has to

1    actually say here is the improvements combined in these

2    patents and those improvements are the reason that people

3    are buying these.  And he didn't say it.

4              THE COURT:  Mr. Scherling.

5              MR. SCHERLING:  Your Honor, I think that Mr.

6    Durbin has some cross-examination he can certainly use at

7    trial for Mr. Napper.  If you go back to Page 236 of the

8    deposition, Mr. Napper does tie in the demand for the

9    planter.  There is a series of questions going on, but there

10   is a question from Mr. Durbin:

11             What do you mean?

12             Mr. Napper talks about how the individual meters

13   are not separately sellable, they don't sell them like that.

14   That is information for a separate price for the vacuum

15   meters.  Then he goes on to the key point we are talking

16   about here:

17             Based on my information, as to the patent

18        functionality -- what Mr. Durbin is talking about --

19        and the benefits of those, and the use of the patented

20        functionality as it relates to what customers are

21        interested in, and I believe it is the basis for the

22        demand for the whole planter.

23             THE COURT:  That seems to squarely join -- Mr.

24   Scherling, continue.  I am only interrupting you because

25   this seems to me, at least on this issue, to be a critical

1    point.   I am trying to get it focused for me.

2           MR. SCHERLING:   I think Mr. Durbin can

3    reasonably make a case for Mr. Napper perhaps being

4    ambiguous in that answer that he is relying on.   But I think

5    that this part of the record clearly shows that Mr. Napper

6    is intending to mean -- and if there is something that was

7    not understood in the deposition or whatever, there is

8    clearly testimony in this case and information in Mr.

9    Napper's report that the demand for the entire planter is

10   based on the patented features.   Those patented features are

11   what improved the performance of the meter.   The meter is

12   the heart of the planter.   The meter is what customers are

13   looking for.   They are looking for accurate seed spacing,

14   and that is what drives the sales of these matters.   That is

15   what Mr. Napper said.

16           I believe it's the basis of the demand for the

17   whole planter.   It is there in the deposition.

18           THE COURT:   Let me let you go on to the other

19   parts of your opponent's argument.

20           MR. SCHERLING:   Your Honor, on the entire market

21   value rule, the Rite-Hite case makes clear that, when the

22   whole machine functions together, Rite-Hite talks about,

23   well, sometimes the entire market value rule might not apply

24   if it is a convenience feature, a disadvantage.   That's what

25   we have here.   We have here that this meter --

1    THE COURT:  I am aware of the <u>Rite-Hite</u> case.  I

2 am not aware of yesterday's case, but I am aware of that.

3    MR. SCHERLING:  By the way, yesterday's case --

4 we have some extra copies of that case, Your Honor.

5    THE COURT:  Wonderful.

6    MR. SCHERLING:  Insofar as it bears on the

7 entire market value rule, I would note that on Page 49 of

8 the slip opinion there, the Court notes that UniLok conceded

9 that customers do not buy Office Windows because of this

10 product activation.

11    We are not making any such concession at all.

12 Mr. Napper says it's the basis for the whole planter.  Our

13 position has been very clear.  It's the basis for the whole

14 planter.

15    I would not read UniLok as changing anything

16 with respect to the entire market value rule or our position

17 in this case.

18    The last point on the entire market value rule

19 besides <u>Rite-Hite</u>, Your Honor, I would point out that the

20 '193 patent in this case -- and we have claims from the '193

21 patent that specifically claim a planter apparatus, not just

22 a seed meter, but the entire planter.  So on the other point

23 raised by Mr. Durbin, I believe he still is unhappy about

24 the methodology Mr. Napper used referring to old

25 calculations, et cetera.  Mr. Napper's report is replete

1    with serious financial information.  You have got operating

2    profits, gross profits, pricing differentials between the

3    different planters, gross margin differentials, research and

4    development differentials between Kinze and Case.  He has

5    done a lot of quantitative as well as qualitative analysis

6    applying the Georgia-Pacific factors in this case.

7            The Hoffman ten percent that he was referring to

8    from the prior case.  There was other litigation between

9    Case and Kinze.  Kinze's expert recommended a royalty of ten

10   percent based on entire planter sales with respect to one

11   feature of a planter.  And Mr. Napper relies on that as a

12   data point in this case.

13           Our view is, in very summed up sort, a summation

14   of that is, that reflects the real-world situation that was

15   existing at the time of what would be the hypothetical

16   negotiation in this case.  Same time period.  Kinze is going

17   on record, saying, we think this one feature in a planter is

18   worth ten percent.

19           We believe Mr. Napper is entitled to consider

20   that as something that was existing at the time of the

21   hypothetical negotiation.  Parties would be looking at that

22   and taking that into account in this case in deciding what

23   the royalty would be worth here.

24           As far as the asserted claims, Your Honor, it is

25   perfectly normal procedure, we started with a lot of claims

1    and, working through discovery, we narrowed down our claims

2    to a more manageable number for trial.

3              We don't believe there is any requirement of Mr.

4    Napper to separately evaluate the value of each of those

5    claims.  Each of those claims contains the essential

6    patented functionality that this whole case is about.  So

7    there is no need to break that down.  There is no further

8    claim-by-claim analysis required.  If Mr. Durbin wants to

9    cross-examine Mr. Napper on that, he certainly can.  But

10   each one of those claims contains what we are talking about.

11   And if any one of those claims is infringed, our position is

12   ten percent on the planter.

13             THE COURT:  Okay.

14             MR. SCHERLING:  With respect to the notice

15   periods, first of all, Your Honor, that is something that

16   they raised in their letter briefing with respect to the

17   motions for summary judgment.  The Court just last week

18   denied that.  We think that is appropriate to go to the

19   jury.  There is a jury instructions on that.

20             THE COURT:  Mr. Durbin.

21             MR. DURBIN:  Judge, if I may.

22             Page -- referring to the term market value rule,

23   the issue, again, I think you heard counsel say exactly what

24   I think Mr. Napper was saying, which is that the meter is

25   important, this is part of the meter, and therefore these

1     are important.

2                    THE COURT:  Here is the problem, Mr. Durbin.

3     You think I heard something.  You really don't know what I

4     heard.  I believe that what I heard is two lawyers ably

5     arguing, from a deposition record, differing sides of the

6     same coin.  I think what would be prudent for me to do is to

7     have the testimony adduced in court, where I have benefited

8     from a full exposition, through direct and cross-examination

9     and redirect of that period.  And should it come to pass

10    that you want to renew your motion, I would entertain that

11    argument at sidebar.

12                    These rulings are without prejudice to the

13    parties' individual ability to raise them anew, denied or

14    granted, either way.  The losing party gets a chance to say,

15    Judge, here is why you should have ruled in our favor in the

16    first place.  You have now heard it.

17                    I think the bell, frankly -- I disagree with

18    you, Mr. Durbin.  Even if I were to permit this to go

19    without a reversal of my ruling, which I am going to, by the

20    way, deny your motion, would permit -- because we are

21    talking about damages, it can be undone by the judge at an

22    appropriate time.

23                    I will let you make your record.

24                    MR. DURBIN:  So we have argued with regard to

25    the entire market value rule, so I will move on.  I think I

 1    need to address the additional points.

 2                    This idea that the reference to Mr. Hoffman's

 3    testimony in prior litigation is acceptable because it

 4    represented the real world, I take issue with that.  Not

 5    even close to real world.  That's testimony of a litigation

 6    opinion in a different case that relied on this factual

 7    presumption, Judge.

 8                    THE COURT:  I worry about that.  Go ahead.

 9                    MR. DURBIN:  Mr. Hoffman relied on and testified

10    that what drove customer purchases --

11                    THE COURT:  Is this the subject of a different

12    motion as well?

13                    MR. DURBIN:  It is also the subject of a

14    different motion.

15                    THE COURT:  Maybe we should discuss it at that

16    time, because I do have a concern about reference to prior

17    litigation.

18                    MR. DURBIN:  That's fine.  I can defer the

19    discussion of that.

20                    THE COURT:  The motion is denied except with

21    respect to that part of the motion.

22                    MR. DURBIN:  Can I finish on the last?

23                    THE COURT:  Yes.

24                    MR. DURBIN:  Individual claims and marketing,

25    Judge.  He cannot be allowed to get on the stand and testify

1    that any individual -- he can't say that.

2              THE COURT:  I need a more specific response than

3    you have given, Mr. Scherling, to Mr. Durbin's position on

4    that.

5              MR. SCHERLING:  Well, Your Honor, I am not aware

6    that any such claim-by-claim analysis --

7              THE COURT:  We are talking about marking.

8              MR. DURBIN:  I am talking about marking, too.

9    But I am talking about the idea that he valued 280 claims

10   and he did not do any individual analysis.

11             THE COURT:  Then you need to react to Mr.

12   Scherling's point on that.

13             MR. DURBIN:  My point on that is, Mr. Napper, he

14   offered no analysis of any of the individual claims or

15   features.  You hear counsel's argument that all the features

16   are basically worth the same.  Each individual claim is

17   worth ten percent.  That is not, that is not what Mr. Napper

18   said.  He never opined on that.  He never did that analysis.

19   I asked him specifically, at Page 217, 218 of the

20   deposition:

21             Question:  Now, you understand that there are

22        hundreds of claims being asserted begins Kinze in this

23        lawsuit.  Right?

24             Then there is an answer:

25             Do you want Mr. Stauffer to come back in?

1        He was excluded.

2        Answer:  Hundreds of claims within the two

3     asserted patents?

4        Question:  Right.

5        Answer:  Yes.  I will characterize, there is lot

6     of claims.

7        Question:  You also recognize the jury could

8     find infringement for some of the claims but not

9     others.  Right?

10       Answer:  Yes.

11           And have you done anything to allocate

12    among the claims, either individually or by groups,

13    the value that is associated with those sets of

14    claims?

15       I have not.

16       It is not in his report.  It is not in his

17    deposition.  He didn't do it.  And he did not reach the

18    conclusion offered by counsel that each individual claim is

19    worth ten percent.  He cannot take the stand and say that.

20       He also, given that there is only 35 or 17,

21    however you count it now, claims at issue in this case,

22    should not be allowed to get up there and say, I will tell

23    you that 280 claims are worth ten percent and, jury, you

24    figure out what the individuals are.  That is a fundamental

25    problem with his analysis.  It cannot be corrected.

1          MR. SCHERLING:  Your Honor, it's implicit in Mr.

2     Napper's report that he was saying, if any one of these

3     claims was infringed, this is the royalty rate.

4          THE COURT:  What do you mean implicit?

5          MR. SCHERLING:  He did not break it down on a

6     claim-by-claim basis.  He just didn't do that.

7          THE COURT:  Your opponent is entitled to notice.

8     Right?  That is why the rule is crafted the way it is.

9          MR. SCHERLING:  Correct.  And I think a fair

10    reading of Mr. Napper's report -- it is surprising this is

11    even brought up.  It is a fair reading of Mr. Napper's

12    report that these claims that we are talking about contain

13    the patented functionalities we are talking about, which is

14    the openings in the housing and the meter.  All these claims

15    contain that patented functionality.  I don't think anybody

16    would read Mr. Napper's report and not come away from that

17    saying if any one of those claims is infringed -- that is

18    where my Georgia-Pacific hypothetical negotiation factors --

19         THE COURT:  Mr. Durbin has come away with that

20    view.  Why don't you tell me, in the report, cite all of us

21    to the location where there exists language from which that

22    inference can be drawn in your expert report.

23         MR. SCHERLING:  Your Honor, I will grab Mr.

24    Napper's report.

25         THE COURT:  That is why we are here.  Go ahead.

1          MR. SCHERLING:  Your Honor, I would also point

2     out that Mr. Napper relies on Mr. Caulfield, the technical

3     expert.  And that's clear from the report and from the

4     deposition.

5          THE COURT:  That's fair.  It just depends on

6     what that technical expert -- what the gentleman is relying

7     upon from that expert.  I am not sure at this point.

8          I am being a little less than clear.

9          MR. SCHERLING:  Mr. Napper relied on the

10    entirety of Dr. Caulfield's reports in which Dr. Caulfield

11    concludes that each one of these claims contains the

12    patented functionality is infringed.  And Mr. Napper clearly

13    relied on all of that.

14         So I may need a moment to find in the report --

15         THE COURT:  Why don't you go ahead and find it,

16    yes.

17         Do you know where it is?

18         MR. DURBIN:  No.  I am quite certain it is not

19    there, Judge.  I will be excited to see it.

20         THE COURT:  Counsel, of course, you should keep

21    in mind, that is why I alluded to the rule, of course, we

22    are talking specifically about Rule 26 and its requirement

23    that the report contain a complete statement of all opinions

24    the witness will express and the basis and reasons for them.

25         MR. SCHERLING:  Your Honor, the report clearly

1    is referring to the patents in suit.

2            THE COURT:  If it was that clear, I don't think

3    we would be talking about this, Mr. Scherling.  But you go

4    ahead.

5            MR. SCHERLING:  Right.  And in a big picture

6    saying the patents in suit contain these features that we

7    are talking about, that is very clear from his report.

8            THE COURT:  Let's find it.

9            MR. SCHERLING:  This is on Page 3 of his

10   report --

11           THE COURT:  Do you have the report, Mr. Durbin?

12           MR. DURBIN:  Yes.

13           MR. SCHERLING:  He starts talking about his

14   understanding of the technology, both of these patents

15   relate to the seed metering technology.

16           Then on Page 5 he starts going into the seed

17   metering technology.  The patents generally relate to vacuum

18   seed meter technology.

19           Page 6, he goes on to what the patents do, an

20   important design feature related to the openings:  And the

21   openings allow the drawing of atmospheric air to promote the

22   release of seeds.

23           He deals with all of that in his report.  Those

24   are the features.  Each one of these claims that we are

25   talking about has those features.

1          MR. DURBIN:  Judge, that is an incredibly

2    broad-brush suggestion of what each of these individual new

3    and useful inventions must include.  Some of these

4    inventions that remain in this case are as specific as, they

5    have openings, but they also have to have the seeds touch

6    the edge of the disk.  They have picked narrow claims,

7    narrow claims to go after here, as a strategic point.

8          Mr. Napper was aware of that -- could have been

9    aware of that at the time.  We couldn't have been.  And he

10    chose not to do any analysis of the actual claims that are

11    left in this case.

12          It is perfectly likely -- more than likely we

13    think, Judge, we are going to knock out these openings.  But

14    it is possible, if we knock out for invalidity purposes all

15    the ones about general openings, and find some little thing,

16    something about the rim, where it is located, above or below

17    the rim of the disk, there is no analysis of that invention.

18    None.  He didn't do it.  He said exactly what is generally

19    described here.

20          These all relate to seed metering, so they are

21    all sort of the same.  The fact of the matter is there are

22    17 unique and novel inventions going to trial.  For him to

23    get up on the stand he needs to have done the analysis and

24    offer the opinion so we could then attack it and be

25    prepared.

1          THE COURT:  Do agree disagree with that general

2     assertion?

3          MR. SCHERLING:  There is one invention in this

4     per patent.  There is multiple claims relating to these

5     inventions.  But there is one invention, the seed meter, and

6     these patented functionalities going to these seed matters.

7          Mr. Napper addressed this in detail.  That

8     functionality, the openings in the housing to promote the

9     release of seeds that is present all these claims, it is

10    that patented functionality which he focused on for his

11    entire Georgia-Pacific analysis, and looking at that is what

12    is important to drive the sales of planters.  That is what

13    we would be talking about, and how much that improves the

14    performance of the meters.  That is throughout his report.

15    That is the essence.  He did not break it down on claim by

16    claim by claim.

17         THE COURT:  Was this discussed in his deposition

18    by your opponent with him?

19         MR. SCHERLING:  I think no more than we have

20    heard, that I recall.

21         THE COURT:  Final word.

22         MR. DURBIN:  I asked him, did you do it, so I

23    could go into it.  He said no.  And I was done.  I don't

24    know what else I could have asked him.  He didn't do the

25    analysis.

```
 1                THE COURT:  But Mr. Scherling says he did.
 2    There is a fundamental disagreement as to what is at issue
 3    here, that is seed meters versus -- he says one invention, I
 4    think that is what he says, two inventions --
 5                MR. SCHERLING:  Each patent is an invention.
 6                THE COURT:  But not 17 separate.
 7                MR. SCHERLING:  There is 17 claims.
 8                THE COURT:  Mr. Durbin, do I misquote your
 9    position when, it seemed to me, you were suggesting there
10    were a number of different inventions?
11                MR. DURBIN:  Absolutely, Judge.  Each of one of
12    these has independent features that have not been evaluated.
13    The seed is touching the disk; the seed is below the rim;
14    the seed is between the plane.  And the openings have
15    already been found not to be novel by the PTO.
16                His concept is, he took every statement in Mr.
17    Napper's report by definition, because he did no other
18    analysis, relates to a subdivision of 280 housings.  He
19    didn't evaluate the value of any 17.
20                THE COURT:  I am not sure that is required.
21    This is a little unfair, but you will be unfair as well.
22                I will let Mr. Boland get in here.
23                MR. BOLAND:  Your Honor, just one minute.  I am
24    more familiar with the claims than Mr. Scherling.
25                THE COURT:  That is fine.  Go ahead.
```

```
 1              MR. BOLAND:  Mr. Napper relied on Dr.

 2    Caulfield's report to make an assumption that if we show

 3    infringement at trial, here is my damages analysis.  Napper

 4    is not technical.  Caulfield is our technical expert.  Dr.

 5    Caulfield went through the claims of each of the patents in

 6    suit in great detail, Your Honor.  He laid out general

 7    comments about the advantages of each of the patents and the

 8    interrelation between the patents, and there is a lot

 9    interrelation between the claims.

10              Even when Mr. Durbin and his team did all these

11    claim charts in discovery and when they are attached to the

12    expert reports, they start out by grouping all the features.

13    There is group one claims, then they list all the common

14    features, and then Mr. Durbin correctly notes, yes, some of

15    them we selected narrow claims where there is an additional

16    feature added.

17              Your Honor, I have never seen a case where a

18    damages expert was put to the task of going claim by claim

19    and saying, I assessed $200 if this claim is infringed.  I

20    assessed $500 --

21              THE COURT:  Hold on just a second.

22              (Pause.)

23              THE COURT:  I believe I have heard enough to

24    rule.  At the most basic level and bottom line, I agree with

25    Mr. Boland's last comment.  I don't, either, know of any
```

```
 1    requirement that a damages expert be put to that level, the

 2    level you suggest, Mr. Durbin, of specificity.  He is

 3    relying on a technical expert.  He is entitled to do that.

 4    You may disagree.  But you will get a chance to discuss this

 5    with him.  On the law, I don't think, at the end of the day,

 6    you are going to prevail with me on that issue.

 7              I am going to deny the motion.

 8              MR. DURBIN:  If I may address, it is a Rule 26

 9    issue, Judge.

10              Dr. Caulfield, they can't cite you any spot in

11    his report where he talked about the value of the specific

12    narrow features that are in the claims that are in suit.

13    There aren't.

14              THE COURT:  Here is what I will let you do,

15    because we spent more time than I really wanted to on this

16    motion.  I will let you talk about it with your opponent.

17    If it is not in the report, it is not in the report.  I am

18    not talking about your take on what he was required to do,

19    because I don't agree with it.  But you are entitled by Rule

20    26 to have a complete analysis to the extent that the law

21    requires the gentleman in this case, the damages expert, to

22    expound.

23              He is entitled to rely on the technical expert.

24              MR. DURBIN:  Is Mr. Napper allowed to testify

25    that each individual claims has the same value as the 4280?
```

1    What is he allowed to say?  I am not sure.

2              THE COURT:  What do you intend to have him say,

3    Mr. Scherling?

4              MR. SCHERLING:  Mr. Napper would testify that if

5    any one of these claims were infringed, that it is worth ten

6    percent of the planter.

7              THE COURT:  Your reaction to that?

8              MR. DURBIN:  It is not in the report.  It is

9    just not in there.

10             MR. SCHERLING:  It is not in the report because

11   there is no requirement that it be broken down like that,

12   Your Honor.

13             MR. DURBIN:  He could have said that.  It just

14   isn't true.

15             MR. SCHERLING:  He did not need to say that.

16   They haven't pointed to a single case that says that a

17   damages expert has to break it down like that.  He is not

18   required to do that.  There would there would be no reason

19   for him to put it in a report like that.  I don't think I

20   have ever seen a report like that.

21             THE COURT:  If you have got a case, Mr. Durbin,

22   that you want me to look at at some point that even comes

23   close to your position, I will look at it.  But right now, I

24   am not persuaded.

25             Except as I started to say earlier for the issue

1    of the reference to prior litigation, I am denying the

2    motion.

3              MR. DURBIN:  As to entire market value.

4              THE COURT:  Yes, as to entire market value.  I

5    am denying the motion.

6              MR. DURBIN:  And marking?

7              THE COURT:  Mr. Scherling, either it is marked

8    or not.

9              MR. DURBIN:  It is actually a stipulated fact

10   that it is not marked.

11             THE COURT:  So do you really want me to have to

12   wrestle with that?  It seems to me to be a pretty clear

13   issue.

14             MR. SCHERLING:  Your Honor, our view, I think as

15   reflected in the Court's denial of the summary judgment

16   letter request, is that there are factual issues here.

17             THE COURT:  Regarding marking?

18             MR. SCHERLING:  We did not mark the patent.

19   That is clear.  But with respect to notice, there are a

20   number of factual issues here.  Our position is that under

21   the unique circumstances of this case, Kinze should be

22   deemed to have notice of this.  We went through them in our

23   letter briefing that was before the Court on this issue, the

24   letter briefing this summer that the Court denied, at that

25   time, just last week.  But we can go through that again.

```
 1                    THE COURT:  You can move again, Mr. Durbin, at

 2     Rule 50 or whenever.  I am going to deny the motion.

 3                    That ten-percent licensing, that other

 4     litigation issue, is that discussed in a separate section?

 5                    MR. SCHERLING:  That is a section in Motion No.

 6     5, Your Honor.  That is where it was initially raised.

 7                    THE COURT:  In Defendant's Motion 5?

 8                    MR. DURBIN:  It is raised in Motion 1 at

 9     Section --

10                    MR. SCHERLING:  1 and 5.  They overlap.

11                    THE COURT:  Section (c).

12                    MR. DURBIN:  At 1.  Then it is part of our

13     Motion 5 regarding the referenced to other lawsuits.

14                    THE COURT:  As to Motion 1, defendant's, the

15     motion is denied except with respect to the issue that is

16     raised in Subsection (c).  It's denied.  I am not going to

17     revisit this issue in Defendant's No. 5.

18                    Your No. 5, Mr. Durbin, is a motion to exclude

19     argument or evidence related to other lawsuits.

20                    MR. DURBIN:  Yes, Judge.

21                    THE COURT:  In addition to this.

22                    MR. DURBIN:  Correct.  There have been several

23     instances throughout the case, starting from the original

24     briefs, where the other lawsuit has been -- they tried to

25     produce it.  We believe since it is a different patent,
```

```
 1     different technology, a lawsuit filed nine years ago, that

 2     there is no -- all it is going to do is create prejudice and

 3     confusion.  We will be forced to retry the various issues,

 4     like this one.

 5              If they were allowed to talk about Corky

 6     Hoffman's opinion, we would have to call Corky Hoffman to

 7     say he concluded that what drove sales is the pivot

 8     transport.

 9              We have 19 hours, Judge.  I don't have time to

10     deal with that.  It is unfair under 403.

11              THE COURT:  Who is going to handle this?

12              MR. BOLAND:  Mr. Scherling.

13              THE COURT:  Mr. Scherling, why is other

14     litigation between the parties relevant?  Why should it be

15     relevant to this jury?

16              MR. SCHERLING:  Your Honor, that prior

17     litigation focused on conduct and statements by Kinze, its

18     counsel.  And what are we are looking at -- we are not going

19     to relitigate that case by any means.

20              THE COURT:  No.  You are not going to get a

21     chance to relitigate that case.

22              MR. SCHERLING:  There is very few items.  That

23     case dealt with planters, just like this case.  It was in

24     the time frame of the hypothetical negotiation.

25              THE COURT:  Why, for instance, isn't there a
```

```
1    risk in referring to other litigation and the possible

2    results or outcomes?  Why don't we then run the risk of

3    confusing the jury, of prejudicing the jury?  The jury hears

4    litigation.  They hear rulings.  They conclude that somehow

5    there is some imprimatur placed upon whatever the result was

6    from the other litigation.

7              It is usually problematic to have other

8    litigation introduced in a case that really can stand on its

9    own two feet, as it were.

10             MR. SCHERLING:  There are certain aspects of

11   that prior litigation that are not very pertinent to this

12   litigation.  As the Mendenhall case we cited in our papers

13   recognized, there is nothing wrong with admitting evidence

14   from or concerning prior litigation in a subsequent

15   litigation.  And certainly a cautionary instruction can be

16   appropriate.  For example, a one party won or lost

17   instruction, that should not be taken into account in the

18   subsequent case.  But the Mendenhall case clearly gives

19   guidance --

20             THE COURT:  I would not give an instruction that

21   one party won or lost, with due regard to my colleagues on

22   the Circuit Court.  They don't try cases.  One has trial

23   experience.  With utmost respect, that would not be an

24   instruction that this Judge would give.  You wouldn't get a

25   chance to have me give that, because I wouldn't let it in.
```

1          MR. SCHERLING:  But the case does recognize it

2     is appropriate to have evidence from prior litigation if it

3     is relevant to the case at hand.

4          THE COURT:  Not just if it is relevant.  I can

5     exercise in this case and may in this case exercise my

6     discretion to exclude it, and never mind its relevance.  If

7     I am concerned about the prejudicial impact of the evidence,

8     that encompasses many things.  Tell me why in this case --

9     we are talking about In Limine No. 5, defendant's -- why I

10    should let anything about prior litigation between these

11    parties before this jury.

12         MR. SCHERLING:  Your Honor, that prior

13    litigation obviously concerned the same parties, it related

14    to the same technology.

15         THE COURT:  Why can't you independently prove up

16    the things you need to prove and/or defend without reference

17    to the prior litigation, counsel?  That is what you need to

18    tell me.

19         MR. SCHERLING:  There are some facts in that

20    prior litigation --

21         THE COURT:  Tell me what they are.

22         MR. SCHERLING:  The fact, for example, of the

23    litigation itself goes directly to Georgia-Pacific Factor

24    No. 5.  The competitive relations between these parties are

25    specific Georgia-Pacific factors.

1                  **THE COURT:  That is fair.  Go ahead.**

2                  **MR. SCHERLING:  At the time period, we are**

3      **looking at a hypothetical negotiation in this case of 2004.**

4      **This case was filed in the early 2000s, I believe went to**

5      **trial, the prior case, in 2005.  The opinions of the damages**

6      **experts in the prior case were given in 2004.  They**

7      **testified in 2005.**

8                **That is exactly in the time frame of the**

9      **hypothetical negotiation in this case.  When the parties --**

10               **THE COURT:  You want the opinions of the damages**

11     **experts in the 2004 or '5 litigation to be adduced before**

12     **the jury?**

13               **MR. SCHERLING:  We don't need to go into the**

14     **details of those opinions.  The important part is that Kinze**

15     **at that time was taking the position that that planter**

16     **technology in that case was worth ten percent.  In this**

17     **case, they have relied on other licenses for similar**

18     **technology that they say relate to the same type of**

19     **technology.  There is a McCarthy license that relates to**

20     **pivot type technology which is similar to what was in the**

21     **previous case.  Their own expert is relying on that type of**

22     **technology in this case.  So we can't say that it is not**

23     **related technology.**

24               **It relates to planters.  So generally, that case**

25     **related to planters.  It sets the stage of these parties**

1    having a very serious competitive relationship.   They were

2    in a lawsuit.   They were in a lawsuit.   They were fighting

3    each other.

4              Case is not going to be interested in licensing

5    to a party that is suing them and it is a very hostile

6    relationship.   That is part of the environment that needs to

7    be taken into account, specifically pursuant to

8    Georgia-Pacific Factor 5.

9              There are a couple other isolated aspects from

10   that case.   One was touched on in the papers.   The lawyer,

11   Mr. Hill, in this for Kinze, he is the lawyer who has given

12   opinions of counsel that they may be relying on in this

13   case.   They said they are going to be relying on opinions of

14   counsel in this case.

15             Mr. Hill, in that previous case, was

16   disqualified upon the motion of Case from representing

17   Kinze.   After he was disqualified, he then rendered the

18   opinions that Kinze has said they are going to rely on in

19   this case.   We believe that disqualification order by the

20   Court on a motion brought by Case would lead to bias.

21   Certainly, we are able to argue, it is clear in the law, we

22   can argue that there is bias of Mr. Hill in rendering his

23   opinions, that he was not an objective opinion-giver.   And

24   the fact that Case moved to disqualify him and succeeded, he

25   cannot be happy about that.   Even to this day, as reflected

1    in his deposition, as we discussed in our papers, he still

2    believes that was wrong, that Kinze went back on an

3    agreement with him and Kinze should not have brought that

4    motion and had him disqualified.

5          If Mr. Hill's opinions are going to be at issue

6    in this case, we are clearly entitled to attack his bias.

7          THE COURT:  I think a witness' bias should

8    always be permitted to be placed on view to the jury.  I

9    think that is probably the least problematic.  I don't have

10   a real concern in that regard.

11         MR. SCHERLING:  A couple of other last points,

12   specific issues that were in our papers from the prior

13   lawsuit, Your Honor.

14         Mr. Kinzenbaw testified in the prior lawsuit

15   that Kinze had no interest in vacuum seeding technology.  He

16   did say that at the very same time that Kinze was actually

17   developing the EdgeVac, and at the very same time they had

18   concerns about infringement over the EdgeVac, they are

19   developing the EdgeVac, they are about to launch the

20   EdgeVac.

21         He is going on record, in deposition, in this

22   prior case, saying, we don't have any interest in that

23   vacuum medium technology.  We really like what we have and

24   we hope Case keeps doing what it has.

25         We believe we are entitled to put on that

1    evidence, Your Honor, of Mr. Kinze essentially trying to

2    divert Case and trying to cover up what is really going on.

3    He was asked about that in this case and he said, well, I

4    was just jerking their chain.

5            We believe that is important evidence that bears

6    on willfulness in this case.  It directly relates to Kinze,

7    willfulness, and copying.  Very important elements in this

8    case.  It is highly probative of willfulness.

9            The last point, specifically, we touched on in

10   the papers about this, Your Honor, there was testimony in

11   the prior case about Kinze's research and development.  To

12   us, that testimony is that Kinze does not put lot of money

13   historically into research and development.  The testimony

14   at the time in that case about Kinze's lack of research and

15   development was at the time the EdgeVac was being developed.

16   So it is relevant to, in this case, Kinze was not putting a

17   lot of R&D into developing the product in this case because

18   they copied it from us.

19           So that evidence of Kinze's lack of research and

20   development is very pertinent, again, to copying in this

21   case --

22           THE COURT:  That doesn't necessitate reference

23   to prior litigation, does it?  That they don't historically

24   or weren't at the time engaged in developing, devoting a lot

25   of resources to R&D?

```
 1              MR. SCHERLING:  Your Honor, two points on that.
 2    One, under Rule 32(a)(8) of the Federal Rules of Civil
 3    Procedure, it specifically says that a deposition may be
 4    used in a later action involving the same subject matter
 5    between the same parties to the same extent as if taken in
 6    the latter action.  That is what we have here.
 7              THE COURT:  But he is going to be on the stand.
 8    Right?  The individual we are talking about, there will be
 9    someone on the stand discussing this?
10              MR. SCHERLING:  We don't know who they will
11    call.  But under Rule 32(a)(8) of the Federal Rules of Civil
12    Procedure, we are entitled to use that previous deposition
13    testimony because it's the same parties, same subject
14    matter.  It's all fair game for us, Your Honor.
15              It's particularly appropriate in this case
16    because we have gotten very little from them on R&D at the
17    time the EdgeVac was being developed.  Their 30(b)(6)
18    representative testified they don't break it down by
19    project.
20              THE COURT:  I got you.
21              Anything else?
22              MR. SCHERLING:  I am fine, Your Honor.  Thank
23    you.
24              MR. DURBIN:  I think what just happened here is
25    an example of why it shouldn't get in.  It took them a very
```

1    short time to throw a whole bunch of stuff up, and for me at

2    this time to show why every one of those things is wrong, it

3    would take me the rest of the day.

4            Let me try to do it a little faster.

5            Point number one, it is not the same parties.

6    Mr. Kinzenbaw was not a party to that litigation.

7            Number two, it is not the same subject matter.

8    To say there is a lawsuit between two parties about planters

9    means it is the same subject matter completely

10   oversimplifies it.

11           That was a lawsuit about a specific patent.

12   That patent had nothing to do with seed meters.  It had to

13   do with how you turn and rotate a planter and transport it.

14   It was, in fact, something that really does drive sales.  It

15   was a very different case with a very different subject

16   matter.  To suggest that these would be admissible for that

17   purpose, they fail to meet that burden to show the same

18   subject matter.

19           As to the R&D, already explored in this case.

20   Absolutely no reference to look into a prior litigation to

21   talk about R&D.  They have a full opportunity to explore it

22   here.  Instead they want to talk about what happened nine

23   years ago in a different case.  Inappropriate.

24           THE COURT:  I think you reaffirmed what I

25   thought I read earlier and as reflected in my notes, there

1    were different technologies involved?

2              MR. DURBIN:  Absolutely, Judge.  This didn't

3    have to do with seed meters.  They are talking about

4    improvements, ways to improve where you put disks and the

5    holes in a seed meter.  This case was about, you got a

6    30-foot-long planter, how do you get through a fence?  You

7    pivot it.  This is about the patent on that pivot.

8              Nothing to do with what we have here.  Not the

9    same subject matter.

10             With respect to Mr. Kinzenbaw, we very much

11   disagree that he has been testifying inconsistently.  We

12   don't dispute that if he testified under oath in a

13   proceeding and they can actually do a proper impeachment,

14   then they can.  But that didn't happen.  And it's not going

15   to happen here.  That is irrelevant.

16             This issue of Mr. Hill is a great one.  The

17   Court began the discussion by saying juries make assumptions

18   about rulings.  That ruling in that case was very narrow and

19   based on very specific facts, and it didn't disqualify him

20   from doing work for Kinze against Case.  It disqualified him

21   from representing Kinze in that case against Case.  That was

22   a very specific ruling, one that probably wouldn't even have

23   applied under the Rules of Professional Conduct before this

24   Court.  We can't explain any of that to the jury.  All it

25   will sound like is he is a bad guy.

```
 1              THE COURT:  Talk about bias.

 2              MR. DURBIN:  Here is how you prove bias:  Did

 3    you work for Mr. Kinzenbaw for 40 years?  Yes.  Good client?

 4    Yes.  Close friend?  Yes.

 5              There is plenty of evidence to prove bias by

 6    talking about his qualifications in a prior case than having

 7    to open up, under 403, wasting time, confusing the issues.

 8    There is no reason for that.

 9              As to the idea that the litigation itself is

10    relevant to the damages calculation, there is no dispute

11    that the parties are competitors.  I guess, if the Court was

12    willing to permit them to say they are competitors and they

13    had prior litigation to show they are against each other,

14    that is fine.  But as soon as you step beyond that and start

15    suggesting that that prior examiner's opinion about

16    different technology at a different point in time, the jury

17    starts extrapolating, the jury may make that leap, I have to

18    call experts and point out the basis is different.  That is

19    wasting the Court's time and my time.

20              THE COURT:  I agree with you, Mr. Durbin.  I

21    think this is a minefield, to permit these references, Mr.

22    Scherling.

23              I am going to grant No. 5 and grant in part

24    Defendant's No. 1, in Subsection (c), the reference to

25    Subsection (c).
```

1          MR. SCHERLING:  Your Honor, can we reserve on

2     that to raise it again?

3          THE COURT:  As I said earlier, these rulings are

4     without prejudice.

5          The only advice I have for you and guidance I

6     have for you is to exercise good, professional judgment as

7     to what you seek to revisit with the Court.  That's all I

8     ask.

9          MR. SCHERLING:  Thank you, Your Honor.

10          THE COURT:  Let's go to Plaintiffs' 2.  This is

11     plodding along a little bit.  I am going to pick up the

12     pace, counsel.

13          Here is my notation to myself, as to Plaintiffs'

14     No. 2 to exclude certain physical devices and related

15     evidence.  I believe the reason I wrote this note is that I

16     concurred at the time in my view of things with the

17     defendants that you have offered plaintiff no supporting

18     authority by way of case or rule for your contentions in

19     your motion.

20          I really think it is a question of weight, not

21     admissibility.  So I am not going to give you much time on

22     this.

23          MR. DURBIN:  Your Honor, if I can do a quick

24     overview.

25          THE COURT:  I am not sure that I need an

```
 1    overview.  But go ahead.

 2              MR. DURBIN:  We have very visual problems with

 3    the defendant's attempts to prove prior art and invalidity

 4    here.  Where you have a patent and it's self-authenticating,

 5    everybody knows the date and everybody knows if it qualifies

 6    as prior art or not.  But in this particular case, they are

 7    relying on physical meters as one example.  One example in

 8    our motion is this Monosem meter.  It's DX-35.  Your Honor,

 9    they purchased it recently.  There is no dispute.  It was

10    not manufactured before the filing dates.  And so during

11    discovery, I established through the Monosem witness that it

12    is not identical to what was on sale --

13              THE COURT:  So it is not prior art, in your

14    view.

15              MR. DURBIN:  It is not prior art.

16              THE COURT:  How about that?  I don't want to

17    spend a lot of time on this.

18              MR. DURBIN:  Absolutely.  Mr. Bakker was

19    examined extensively by Mr. Boland, then by members of our

20    team.  And he explained that there are distinctions, minor

21    distinctions, such as ribs having the casing.  None of it

22    has any relevance to what we are talking about here.

23              He said it works the same.

24              MR. BOLAND:  Your Honor, I pointed out in the

25    motion, there was differences in the casting of the housing.
```

1    They added a rib to the cover.  That is part of the housing.

2    There were changes to the plastic to affect the flow of

3    seeds, changes to the seed agitator, changes to the whole

4    configuration in the housing, gasket part of the assembly,

5    and a row pin with the bussing shaft.

6            What you are hearing is attorney argument.  For

7    them to try to come in with this Monosem and say, oh, well,

8    this fairly represents the prior art, it was their burden to

9    have, for example, a technical expert do a very discrete,

10   strict identity comparison and show here is what was in the

11   prior art and here is what Monosem has now, and these

12   differences don't matter a hill of beans, Your Honor.

13           Our expert looked at it and said they do matter.

14   They would affect the performance of the meter.

15           We totally disagree with Mr. Durbin.  All you

16   are hearing is his arguments that these things are

17   irrelevant.

18           To the extent Mr. Bakker said in his deposition

19   that he thought they were minor or something, he has no idea

20   what the issues in the case are, in our case, in terms of

21   validity or infringement.

22           We think that Monosem meter simply should not

23   come in.  It's just not prior art.

24           And testing was done on it.  We don't think that

25   should be admissible either for that very reason.

1            Plus, they have an old Monosem meter.  They have

2    one from 1989.  We don't object to it.

3            We are not looking to strip them of all their

4    evidence.  We want to make sure that what is presented to

5    the jury was actually prior art and is not misleading or

6    prejudicial.

7            On Monosem, we simply don't think it should come

8    in.

9            With respect to the Deere meters, again, we are

10   not objecting to all of them.  But a few particular meters,

11   we pointed out, they lack critical components.  So this is

12   a real, live --

13           THE COURT:  I don't want to have a mini-trial on

14   this.  It seems to me this should be something that counsel

15   could get together on.

16           MR. DURBIN:  We think so, too.

17           We think that this is all cross-examination for

18   the weight, not admissibility.  We have a difference of

19   opinion on what Mr. Bakker said.

20           THE COURT:  I am not sure I agree on that.  What

21   resonates with me is what Mr. Boland just said.  It is often

22   the case that the Judge is confronted with really pure

23   attorney argument.

24           MR. DURBIN:  I could read the testimony if you

25   would like, which says there were minor changes.

1          THE COURT:  Do you have a Monosem meter that is

2     clearly prior art?  What do you need the additional -- why

3     do you need to gild the lily?

4          MR. DURBIN:  It was during --

5          THE COURT:  He can't take us down together.  He

6     is going to take down what I say.

7          MR. DURBIN:  Certainly, Your Honor.

8          We have a Monosem meter that is attached to a

9     row unit that was loaned to us by Monosem.  It is very old.

10    What we have done -- in fact, you have a picture, you have a

11    set of pictures as Exhibit G to our motion that shows that

12    row unit and compares it to the one that was used, for

13    example, for the testing.  And you can flip through those

14    and see, and I can show you the kind of changes we are

15    talking about here, Judge.

16         Take, for example, Exhibit G in our response.

17    You can see on the left is the one that was the testing.  On

18    the right is the one that is on a row unit.  Hard to take

19    off or, frankly, that will break it.  So we take it off

20    there.  It can't be used for things like testing.

21         The next page, see on the bottom left, that

22    testing meter, in the lower right, you will see some lines,

23    there are ribs added to the housing.  Look at the one on the

24    right.  That is the ribs we are talking about.  It has

25    nothing to do with the openings in the device.  There is no

```
 1    evidence that it actually impacts performance.  None.

 2              Dr. Caulfield, despite the statement, he didn't

 3    offer that opinion, whereas Mr. Bakker said there were

 4    minor improvements.

 5              MR. BOLAND:  Your Honor, that is attorney

 6    argument.  The record is that there is no evidence that the

 7    changes would be immaterial or whatever the standard would

 8    be when a party tries to rely on non-prior art as prior art.

 9    There is no standard because people just don't do it.

10              The Transclean case that they cite in their

11    brief, they say, people can rely on later things.  In

12    Transclean there were prior art machines.  The question was

13    whether the proponent of them could show that they had been

14    unaltered.  There were some alterations made.  The proponent

15    of them made a prima facie showing that the alterations were

16    not significant or material to any issue in the case.  And

17    based on that showing, an evidentiary showing, properly

18    supported --

19              THE COURT:  You are saying we don't have that

20    here.  What we have is attorney argument.

21              MR. BOLAND:  What we have is Mr. Durbin's

22    argument.  We have our expert testimony saying that it

23    should be -- they would affect performance.  The meter is

24    not the same today.  There is no dispute that it is not the

25    same.  It is just not prior art.  So they want to bring it
```

1    in.  And they have done testing on it.

2                We think it shouldn't be admissible, Your Honor.

3                MR. DURBIN:  There is an evidentiary record --

4    Dr. Stein, Mr. Bakker, the actual physical evaluation of the

5    devices.  These are factual issues for the jury to decide,

6    is it prior art or is it not prior art?  There are no

7    modifications.  There is no testimony in this case to

8    suggest that these modifications had any impact on its

9    performance.  None.  Talk about attorney argument.  That is

10   attorney argument.

11               We have the right to present the evidence to

12   show, like Mr. Bakker's testimony, these were minor changes

13   to the housing.  They have nothing to do with what is

14   claimed in the features.  The jury will get to decide

15   whether it is prior art or not.

16               MR. BOLAND:  Your Honor, if I may.  It is not

17   prior art.  The technical experts, to the extent they have

18   addressed it, Dr. Stein, their technical expert, he did not.

19   He did not make the showing.

20               What we have is Dr. Caulfield, Paragraphs 311

21   and 312 of his rebuttal report, he explains why the

22   differences would affect the performance.  We think it is

23   entirely improper to admit a current-day device, go buy one

24   off the Internet, come to court and say this violates a

25   patent that was filed in 1996.

1          THE COURT:  We are going to see whether they get

2    to do that.  I am going to let it in.  This is a live issue

3    as far as I am concerned.  I am going to stick by my initial

4    instincts, inclinations, after reading the briefs.  I have

5    not heard anything to persuade me otherwise.

6          Go ahead.

7          MR. BOLAND:  On another issue on this motion,

8    Your Honor.  There is a whole category of what we called

9    unidentified third-party meters and so on.

10          In discovery, we exchanged infringement

11    contentions and invalidity contentions on set dates.  We

12    took discovery.  And Kinze relies on certain Krause prior

13    art, Monosem prior art, and John Deere prior art.

14          We subpoenaed them in discovery.  Third-party

15    discovery happened.  And a record was developed.  After fact

16    discovery was closed, we got their technical expert report,

17    Dr. Stein.  In his report, he now talks about 18 U.S.

18    patents, a number of unidentified brochures, and perhaps

19    five or six meters by Nodet, Gaspardo, Accord, which are

20    European companies.

21          No model numbers were given.  No exhibit numbers

22    were given.  There has been no record developed on them.

23    And he doesn't really even explain why he is relying on

24    them.  We think they are totally improper.  They are not

25    part of the invalidity contentions.  They were not cited in

1    any claim charts attached to Dr. Stein's invalidity report.

2              So now what we get, after we file this motion in

3    limine, on New Year's Eve we get a 282 notice from the

4    defendants where now they have put in claim charts on all

5    this prior art that doesn't appear in the reports.

6              Your Honor, I am flabbergasted.  We have a

7    moving target.  They are adding new prior art on the eve of

8    trial.  I just think this is entirely improper, this entire

9    category of evidence.  There is no foundation, there is no

10   proof that any of this is prior art, and there is no expert

11   testimony on it.

12             MR. DURBIN:  I think we have had a motion on

13   this, but I will address it, Judge.

14             We couldn't disagree more strongly.  Much of the

15   prior art is actually cited, and the foundation has been

16   laid in the testimony of their own inventors.  These are the

17   things their people testified and they reviewed in

18   connection with their development of meters.

19             THE COURT:  This is Category (d)?

20             MR. DURBIN:  Yes.  The documents and materials

21   that are included are things that were in the prosecution

22   history.  The analysis of Dr. Stein is set forth in his

23   invalidity report in great detail.

24             Part of what we have here, Judge, is more about

25   what I would call the strategic choice of the plaintiffs to

```
 1    assert 280 different claims throughout the course of this
 2    proceeding.
 3             I would like to talk to you a little bit about,
 4    if I may present you with Dr. Stein's invalidity report, so
 5    you can get an idea --
 6             THE COURT:  Don't have time.
 7             MR. DURBIN:  Okay.  I will make it visual.  That
 8    is the claim chart cited for just one patent.  The other one
 9    is in there.  Three hundred pages of claim charts, 80 pages
10    of text, where he specifically talks, for example, on Page
11    52 about these pieces of prior art they are talking about
12    and how they relate to his claims.  Then he goes through in
13    excruciating detail on the Monosem, the Krause, and the
14    Deere, then individual brochures, individual pieces of prior
15    art, for every single element of 280 claims:  Here is how
16    the Monosm meets it; here is how the Deere meets it; here is
17    how the Krause meets it.  And you can obviously
18    combine any of those because they all have the elements.
19             Anyway, my point is, they have been fully
20    disclosed.  The foundation is laid for fact witnesses, as
21    well as discussion of the disputes in Dr. Stein's report,
22    which is very extensive, Judge.  To the extent there is any
23    concern of confusion, our ability certainly to address this
24    in an individual form was greatly enhanced when they decided
25    after expert discovery was closed to take it from 280 down
```

1    to 16.

2                    THE COURT:  Do you want to address the timing

3    problem.

4                    MR. DURBIN:  I am not sure what the timing

5    problem is.

6                    THE COURT:  The New Year's Eve...

7                    MR. DURBIN:  That is the date it was due.

8    Everything in the -- there was nothing new in the 282

9    notice, Judge.

10                    MR. BOLAND:  Totally disagree.

11                    THE COURT:  Surprise, surprise.

12                    MR. BOLAND:  Your Honor, on the 280 claims, we

13   had a conversation with the Court, among many the Court has

14   had, I am sure, about midyear when they raised this point of

15   too many claims.  Your Honor, those are our clients'

16   property rights.  The number of claims in each of the

17   patents in suit is roughly 200.  We found literal

18   infringement of a-hundred-and-some of each.  It adds up to

19   280.

20                    When we filed suit -- we would not be

21   representing our client properly if we didn't assert every

22   claim that we found that was literally infringed.  We

23   thought we could have asserted more.  But we put them out.

24   Our expert did all the work.  Our expert showed the literal

25   infringement.

1          Their expert, they claim he did a thorough job

2    on invalidity.  And it was always with the view that after

3    we saw how the case developed, how discovery developed, we

4    saw their expert reports, we saw what their actual defenses

5    were, we had every right to then for practical purposes

6    narrow the list of claims for trial.

7          And we are down to 16, there is not 35.

8    Actually, we are contemplating, given the time constraints,

9    as with any trial, we are contemplating even narrowing it

10   further, so we can make a nice crisp presentation to the

11   jury.

12         So the number of claims is neither here nor

13   there.

14         What is here nor there is in the claim charts

15   that relied on Krause, Monosem and Deere.  There is no

16   foundation.  For example, they now are coming out with

17   something called a Matermacc meter.  And after the close of

18   discovery in recent weeks, they have been making document

19   productions to us with pictures of the Matermacc.  And now

20   there is claim charts in this 282 notice about a Matermacc

21   meter and an Accord meter and a Wick meter.  We don't know

22   what they are.  We don't know if they were even on sale in

23   the U.S.,  if they were in public use in the U.S.  These are

24   European companies.  There is just no record.  There is no

25   foundation.

1          THE COURT:  Mr. Boland, I am going to deny.

2     Make your objections in realtime.

3          MR. BOLAND:  Thank you, Your Honor.

4          THE COURT:  We will address them.

5          Defendant's No. 2 I am going to deny.  We need

6     to move along.  It is my view this is pure attorney

7     argument.  You are taking excerpts of testimony out of

8     context.  You can cross-examine the Plaintiffs' experts.

9     There is no basis to conclude that the expert's opinion --

10    for me to conclude, based on these submissions -- and I will

11    not permit additional argument on this -- that Plaintiffs'

12    argument is not scientifically based, and therefore

13    unreliable.

14         Your DOE argument is an attempt at summary

15    judgment.  And I will deny that as already having been

16    rejected.  That is the Court's ruling.

17         MR. DURBIN:  Your Honor, may I address one

18    issue?

19         THE COURT:  No, you may not.  When the Court

20    says that's the Court's ruling, I am done.

21         No. 4, defendant's motion to exclude opinions of

22    plaintiffs' patent law experts, I have in big bold print:

23    No patent law experts.  I don't permit them in my Court.

24         This motion is granted.

25         MR. SALIBA:  Your Honor, this is again --

1          THE COURT:  They don't exist.  They don't live

2     on this earth, as far as I am concerned.  They have no

3     business here.  I am the expert on patent law.

4          MR. SALIBA:  Your Honor, may I address one point

5     on that issue?

6          THE COURT:  Yes.

7          MR. SALIBA:  What is at issue is willfulness,

8     our charge of willfulness, and Kinze's reliance on opinions

9     of counsel and whether the standard was appropriate or not,

10    whether those opinions are competent.  The question then is

11    how does a jury get -- how is a jury able to benchmark

12    whether those opinions are competent or not?

13         THE COURT:  You want to call an expert to say?

14         MR. SALIBA:  To discuss simply the competence of

15    the opinions that were rendered back in 2004.  We are not

16    talking about their current litigation defense.  We are

17    talking about whether Mr. Hill's opinions on which Kinze is

18    relying on are competent.  And the jury, frankly, will not

19    be able to make that assessment.

20         THE COURT:  Competence of opinions can be an

21    issue.  I agree with that.

22         Just a word:  Patent law expert, I have a

23    visceral reaction to that.

24         MR. SALIBA:  I appreciate, that Your Honor.

25    Back in July of this year you made that clear during a

1    discovery conference.

2              Mr. Osha is not a patent law expert.  He is

3    simply an expert opining on the competency of the opinion.

4              THE COURT:  That is a different proposition.  Go

5    ahead.

6              MR. SALIBA:  To the extent that Kinze's Motion

7    in Limine No. 4 wants to take a broad-brush stroke and wipe

8    out all his testimony, it is sweeping in Mr. Osha's opinions

9    on the competency.

10             We would ask that the Court consider having his

11   testimony.

12             MR. HORWITZ:  Your Honor, I have this one.

13             He is a patent law expert.  In their papers,

14   they try to do two things.  One, they say that he is talking

15   about the reasonableness of what a corporation can do in the

16   way that they consider the patents that are out there, the

17   processes and everything else.

18             He has never been an inside counsel.  He has

19   been an outside counsel his entire career.  Judge Jordan in

20   one case, they tried to mention last summer when we had the

21   first go-round on this, he allowed a person who was an

22   in-house counsel and a chief patent counsel for several

23   companies, that was the Oxford Gene case, to talk about the

24   reasonableness of what the company did.

25             Here you have got an outside counsel who has

1    always been an outside counsel, he doesn't have the

2    experience that even -- if you wanted to consider the issue

3    the way Judge Jordan considered it, this isn't a person that

4    can do it.  He is just an outside counsel.

5           There is nothing more.  We cited, I think it's

6    great language from the Federal Circuit from 2008 in the

7    <u>Sundance</u> case:  It is no more than advocacy from the witness

8    stand.

9           He is going to talk about the opinion, the

10   substance of the opinion, what was done.

11          I said this when we met in July on the

12   telephone:  That is not the way it's done in this Court.

13   What is done in this Court is, when, either through

14   deposition testimony or when somebody from our client is on

15   the stand, they will say, well, you know, did you think of

16   this, did you think of that, what about this, what about

17   that, you do it through cross-examination.  You don't put an

18   expert on the stand who is just a lawyer.  It is plain and

19   simple.

20          This case is no different, Your Honor, than any

21   other patent case.  There are no arcane issues that would

22   require a lawyer to get on the stand and talk about

23   willfulness.  We just shouldn't waste the time of the jury.

24          And, in fact, they have a motion as to an expert

25   that we brought in, I think that one is No. 5, Mr. Nixon,

1    and we said in responding to that one, we only got an

2    expert --

3              THE COURT:  I have eliminated the issue by

4    banning both party's attorney experts.

5              MR. HORWITZ:  We only got ours because you said

6    we will give them a motion in limine today.

7              THE COURT:  That is what I am going to do with

8    this, Mr. Horwitz.  I will ban both parties' attorney

9    experts.

10             MR. SALIBA:  Is that also Mr. Kunin on Patent

11   Office policies and procedures, which is different --

12             THE COURT:  It is out.  It is not different, in

13   my view.

14             MR. HORWITZ:  We took care of two motions.

15             THE COURT:  Right.

16             No. 5 is Plaintiffs' motion to preclude certain

17   testimony of Kinze's expert, Mr. Nixon.  That is granted.

18   And No. 4, defendant's motion is granted, a similar subject.

19             I have in front of me Plaintiffs' No. 3, to

20   exclude evidence of obviousness and to preclude Kinze from

21   asserting a practicing prior art defense.  Hold on.  As to

22   this Plaintiffs' 3, I am only going to hear argument on the

23   practicing art issue.  I am going to deny the motion in all

24   other aspects.

25             MR. BOLAND:  I will address that, Your Honor.

1    On that practicing the prior art issue, our concern is

2    that --

3                THE COURT:  Just, Mr. Durbin, for your

4    edification, my feeling about the balance of the motion is,

5    I can handle these objections in realtime.

6                MR. BOLAND:  I think I can follow that in your

7    comments so far.  And I appreciate it, Your Honor.

8                But the practicing the prior art, Your Honor, we

9    all know if Kinze's accused product is strictly identical to

10   some particular discrete item of prior art, regardless of

11   any Federal Circuit case, that either doesn't infringe or

12   it's invalid.  But those aren't the facts.

13               What Dr. Stein, the technical expert, does in

14   his report is he selects particular features of the EdgeVac,

15   and he says, oh, this arcuate opening, it's known, and he

16   points to some prior art.  He does random elements, one at a

17   time, and says, therefore, if it infringes it must be

18   invalid.

19               Your Honor, we think that's wholly improper.

20   And we are asking that the Court exercise its proper

21   discretion to simply keep infringement separate from

22   validity.  We are asking for an order that would bar

23   testimony or argument, just like I said.  Just because this

24   particular feature may be known, that doesn't mean that the

25   claim is either invalid or ties the two together, because

```
 1    that's not the proper standard.  And that would result in

 2    massive confusion to the jury.

 3              MR. DURBIN:  Your Honor, I will handle this one.

 4              I disagree with what they are saying we are

 5    doing.  We are not saying, we have never said that

 6    practicing the prior art is a defense to literal

 7    infringement.  It gets into the case, because as you just

 8    pointed out, DOE is in the case.  So it is coming in for

 9    that.  It comes in for willfulness, so we can say those

10    words if we want to.  We haven't yet, but we can.

11              As to the specific point, it also comes in for

12    inducement.  They have a claim for inducement, it is

13    relevant for that.

14              As to the specific things that Dr. Stein did, he

15    didn't just randomly state that, therefore, it must be

16    invalid.  He said, plaintiffs have taken the position before

17    the PTO and in this case that this is what an opening is.

18    Then he says -- and they have taken the position that it is

19    not in these six other pieces of prior art.  And then he

20    said, take a look at ours and decide whether it is an

21    opening, not whether it is reflected in the prior art.

22              It is a credibility challenge to the very

23    fundamental aspect of what they are claiming.  I don't think

24    we are actually going to have an issue at trial.  They can

25    raise it if we do.  I think it should be denied at this
```

1    point.

2              THE COURT:  I think it should be denied.  If it

3    should come to pass that we need to join this again, we

4    will.

5              This is Defendant's No. 3 to exclude

6    uncorroborated inventor testimony and incompetent evidence

7    regarding date of conception.

8              MR. DURBIN:  I will be brief, Judge.

9              We believe that there is a high risk of

10   prejudice and confusion if they are allowed to suggest to

11   the jury that they invented all of the elements of any of

12   these 16 claims prior to the date we propose, which is April

13   of 1996.  There is no -- and you can look through their

14   brief -- there is no testimony.  The inventors themselves,

15   they didn't know the precise date.  So it is not even about

16   corroborating if they didn't know.  Then there is this one

17   document, which is a big -- it is a drawing marked

18   "obsolete," that they are attempting to interpret to

19   determine a period or point in time where things were

20   invented prior to the first entry on that sheet.

21              That drawing is Exhibit B to our motion.  From

22   what I have seen, the entirety of the support for a prior

23   invention or earlier invention date is this document, and

24   this is Exhibit B to our motion, and it has a date on it

25   that it was created February 7th of 1995.  You can't see, it

1   is down in that lower corner.  Then the actual markings on

2   here don't start till April 25th of 1996.

3          So they put on the stand a corporate rep, who

4   was not working at the company at the time this happened,

5   who said, well, since it's on there, it must have been

6   invented before February 7th of 1995.  Well, he has

7   absolutely no foundation for that.  He didn't even work at

8   the company.  He can't offer that testimony.

9          So we asked one of the actual inventors, John

10  Stuckelbeam, what happened prior to April 25 of 1996?  Can

11  you tell from this drawing?  And he said, no.  Nobody can

12  tell that.  His testimony is very clear.  I won't cite the

13  Court to that, unless you want.

14          The fact of the matter is, if they are allowed

15  to get up and argue that they invented it, we are going to

16  spend a big part of the case trying to disprove that alleged

17  invention, that not one witness or inventor even said that

18  they can pinpoint the date that all of the features of each

19  of the asserted claims is invented.  And this document

20  cannot fix that for them.  They have no one who has a

21  foundation that can explain the document.

22          THE COURT:  Let me ask this.  I think I denied

23  Case's No. 1 today, did I not?

24          MR. DURBIN:  Yes, Your Honor.

25          THE COURT:  Here is the statement that I think

1    is most pertinent in your reply, Mr. Durbin.  That is this:

2    If CaseIH's Motion No. 1 is granted, which it was not, so

3    let's go to the CaseIH's motion is denied, Kinze's motion

4    should also be denied because CaseIH will prove at trial

5    that the subject matter of most asserted claims was reduced

6    to practice by spring 1995 prior to any work by Krause on

7    its two-head design.

8            Go ahead, Mr. Durbin.

9            MR. DURBIN:  I essentially proved that in the

10   depositions.  Quite a number of the Case inventors have left

11   the company and they are on to different pursuits.  There is

12   one gentleman in particular, Lyle Dunham, who was heavily

13   involved in this seed meter aspect of this new planter.

14   Unfortunately, the R&D group from Case has moved a couple

15   times over the years.  We couldn't find a hundred-percent

16   complete set of all documentation that existed from those

17   olden days.  But we got enough.

18           So if it is proven at trial or shown to the jury

19   at trial over what may be our residual objections then on

20   this two-hole device, we are going to walk through the

21   documents.  And they start in 1994, and they go up through

22   prior to this alleged Krause on-sale bar in the spring of

23   '96.

24           The documents all summarize here, DX-62 is one

25   set of engineering drawings that Mr. Durbin makes his

1    arguments about.  He can make all the arguments he wants.

2    What that shows is that the drawing started in February '95.

3    We will walk through all the documents received then and

4    show how the program got started, what the goals were, what

5    some of the early work was, designing in the lab, how they

6    were going to design the meter, trying different things,

7    seeing what worked the best.

8         By the time you get up to February of '95, when

9    that drawing was started, they had set out a pretty concrete

10   design.  That is what that reflects.  And those holes were

11   in there from the beginning.  You can tell that because

12   things that were added later have these little balloons

13   drawn to them.  We argued that in our paper.  They didn't

14   ask our 30(b)(6) designee the proper questions to elaborate

15   on that.

16        Your Honor, I can assure the Court that we can

17   come in and establish an actual reduction to practice by

18   spring, summer, 1995 and again in February 1996.  We have

19   the proof to do it.

20        THE COURT:  I will give you a chance to do that.

21        The motion is denied.

22        Finally, with regard to motions in limine, what

23   interested me, the only thing that interested me in this

24   motion, Mr. Boland, was I think Subsection (d).

25        MR. BOLAND:  I am sorry, which particular

1    motion?

2              THE COURT:  This is 4.  This is the last of your

3    motions, to exclude evidence relating to testing of seed

4    meters.

5              My instinct or inclination after reading it was

6    in the main the motion should be denied.  But I will hear

7    you on it.  I was most interested in Subsection (d).

8              MR. BOLAND:  In the PI phase, Your Honor, Kinze

9    comes to the Court and says, there is no infringement

10   because what we had done at the time is our expert, Dr.

11   Caulfield, analyzed the EdgeVac.  We picked half a dozen

12   claims, maybe it was four or five, I don't remember, he did

13   an infringement analysis.  We found literal infringement.

14   He did not test the EdgeVac, but he did a lot of analysis of

15   it.

16             There is one important feature.  You will hear a

17   lot about it at trial.  It is particular openings in either

18   one side of the meter or the other or both that function to

19   promote the release of seeds from this rotating disk at the

20   desired spot.

21             So airflow inside the meter is important.  And

22   that would be a critical aspect at the trial.

23             In our PI proofs, Dr. Caulfield relied on Kinze

24   documents, patents, and particularly a Kinze patent that

25   relates directly to the EdgeVac, where, by Kinze's own

1    admissions, it functioned in the way and simply by looking

2    at it and comparing it to the patent, you can see it.

3    Nonetheless if, Kinze comes back with its noninfringement

4    case in the PI, and they attack us, they attack Dr.

5    Caulfield.

6              I have the heading from their brief:  Dr.

7    Caulfield's Failure to Test the EdgeVac Renders His

8    Infringement Opinion Unreliable.  They went so far as to

9    move to strike his declaration, which was this thick, and

10   lots of exhibits.

11             So that was the setup.

12             They came in with testing from their expert, Dr.

13   Stein.  It was lab testing.  They took the EdgeVac and they

14   put it on what's called a test stand in a lab.  They mount

15   it.  They hook up a vacuum source to it.  They run a bunch

16   of seeds.  Then you can measure the seed spacing and

17   accuracy when you do that.  The seeds go down, in their

18   case, onto a grease belt.  You can see how the accuracy

19   looks.

20             They did the lab testing.  And it had what we

21   call this basic statistical analysis of standard deviations

22   of the data and so on.

23             So the PI was denied.  We moved on with the

24   case.

25             Looking at the positions they took in the PI and

1    the representations that were made to the Court that testing

2    is required to show infringement, Your Honor, Dr. Caulfield

3    went to the Case people and studied up on these test stands

4    in particular, mapped out a comprehensive testing program,

5    and comes up with his own results.  Without debating the

6    merits of whose results are right or wrong, I think that is

7    an issue for the jury and I think we are going to win.

8            But what Kinze then did is in its expert

9    reports, Kinze tried to raise the bar.  And after telling

10   the Court and telling us in the PI phase that the industry

11   standard only required lab testing, that they had met the

12   industry standard, that their lab tests showed, improved

13   their results to a degree of scientific certainty, a

14   reasonable degree of scientific certainty.

15           Now they have come out and said, oh, no, you

16   don't just have to do that.  You have to take it another

17   step.  You have to hire a Ph.D. statistician.  You have to

18   conduct these things called inferential analyses and stuff

19   that, honestly, Your Honor, I can't even understand.  They

20   are in this report by Dr. Stec.  But they simply take the

21   normal industry standard data that comes off these test

22   stands and take it to another level of rigorous statistical

23   analysis, and say if you are not doing that, what you are

24   doing is just a biased eyeballing of the data.  That is what

25   they are accusing Caulfield of doing now, despite the fact

1    their own expert did that in the PI phase.

2              Your Honor, again, we think this is totally

3    improper.

4              Our motion as a whole says they shouldn't be

5    permitted to criticize Caulfield's data or analysis as not

6    matching an industry standard because he didn't do this

7    higher level analysis.  I think the record is going to show

8    at trial what the industry standard is.  If we are going to

9    do testing, we did it in the proper way.

10             Another point.  Your Honor's concern about (d) I

11   think is a very valid one, and that if Kinze takes the

12   position that testing is required to show infringement, and

13   even now they say a higher level of testing plus this

14   high-level statistical analysis is required to show

15   infringement, how could they possibly say prior art

16   anticipates with no testing?  They didn't do any testing on

17   this Krause prior art or the Deere prior art.

18             Of course, Your Honor is well aware that

19   infringement is shown by a preponderance of the evidence.

20   They have a clear and convincing evidence standard to show

21   invalidity.  To meet a lower standard we have to do testing.

22   Then for them to invalidate the patent, oh, there is no

23   reason to test.  They didn't do it.

24             We think it would be fundamentally unfair for

25   Kinze to be permitted to go forward at trial and make those

1    kinds of arguments and put on that kind of evidence.

2         Thank you.

3         THE COURT:  I am going to take a moment and read

4    this rather lengthy quote because I want you to react to it.

5    Then I will give Mr. Durbin a chance.  I am at Page 5.  It

6    is their Subsection (d):

7              CaseIH argues that Kinze should be precluded

8         from arguing invalidity with respect to the Deere

9         meter and Krause seed cup because Kinze allegedly

10        represented to this Court that to prove infringement

11        of the asserted claims that the device in question

12        must be tested.

13             I am going over much of what you said.  But I

14   want a more specific reaction.  And, Kinze did not test

15   either the Deere or Krause prior art devices.

16             Here is part of what confronted me in most of

17   these motions in dealing with them.  Again, this is a

18   mischaracterization of the record.  And clearly, I don't

19   have the entire summary judgment record or discovery record

20   before me.  If I did, I wouldn't have the time to review it.

21             This is one of the reasons I am going to

22   severely reduce the number of motions in limine that counsel

23   will, going forward, be permitted to bring to this court in

24   any event.

25             It was CaseIH's expert -- and that has been

1      manifest as well in the oral argument I have heard today

2      from both sides, quite frankly.

3                   It was Case IH's expert, not Dr. Stein,

4              who repeatedly testified he could not determine

5              whether openings in prior art meters met the claim

6              limitations without testing.

7                   There is a citation.

8                   That is what Kinze brought to this Court's

9      attention, not that Dr. Stein required testing to analyze

10     the product.

11                  CaseIH's expert has since abandoned his

12             unequivocal position that testing was required and now

13             claims it is not (presumably because he didn't).

14                  In any event, neither Case nor Dr. Stein has

15             taken the position that prior art testing is required

16             to prove invalidity.  Thus, the very basis of CaseIH's

17             motion is belied by the record, and the motion

18             should be denied.

19                  MR. BOLAND:  Your Honor, we stand by our

20     characterizations.  I have read you a quote from the PI

21     papers.  Dr. Caulfield's failure to test the EdgeVac renders

22     his opinion unreliable.  They made arguments in their brief

23     and moved to strike on no testing.  This refers to the PI

24     deposition.  It was in 2009.  At that point in time Dr.

25     Caulfield had given his original declaration which I

1    explained did not include testing of the EdgeVac

2    infringement, and we were relying on the presumption of

3    validity and the fact that each patent had undergone

4    reexamination.  We weren't aware of any prior art that we

5    felt was relevant to the claim.  There was nothing to deal

6    with the test.

7              It is not our burden to do any testing of prior

8    art.

9              What these quotations came out of is a

10   deposition which Mr. Durbin took, where he thrust in front

11   of Dr. Caulfield certain physical meters, like this Monosem

12   that I mentioned earlier, and started asking him questions.

13   And Caulfield said, I have never seen this.  I don't know

14   what it is.  I don't know how it works.  I would have to

15   study it.  I would have to analyze it.  I might even have to

16   test it to answer your questions.

17             He was fending him off over the course of a long

18   time, Your Honor, and he did it with multiple things that he

19   hadn't seen or analyzed before.

20             As any expert would, he is simply going to

21   respond, I am not giving you an opinion until I can do a

22   full-length -- he is a professional engineer.  I am not

23   going to give you an off-the-cuff opinion.  I have never

24   seen this before.  I have to study it.

25             In some of his answers, yes, I think he said I

1    may even have to test it.  There is no record in this case

2    anywhere where Dr. Caulfield said unequivocally it is a

3    requirement to test prior art meters.  That is the genesis

4    of these quotes, Your Honor.

5            Our position relates to Kinze's behavior.  I

6    think it really can't be seriously disputed that they have

7    moved to strike Caulfield because he didn't test the

8    EdgeVac.  And they claim now even higher levels of testing

9    and analysis are required to show infringement and that

10   Caulfield didn't do those.  That's part of what we are going

11   to hear at trial, is that Caulfield didn't do the

12   statistical analysis of his testing.

13           So then our position falls back to the simple

14   one which I argued to Your Honor.  Under those

15   circumstances, Your Honor, how could Kinze possibly be

16   permitted to argue that the prior art does the same thing

17   without testing when they have a higher burden than we do

18   for infringement?

19           MR. DURBIN:  Your Honor, simple.  As said in our

20   brief, we have never said -- Dr. Stein has never said that

21   testing is required to prove invalidity.  The motion to

22   which they are referring, the motion to strike Dr.

23   Caulfield's testimony, I would encourage the Court to read

24   it.  I know you are challenged for time.  We challenged his

25   analysis on two bases.  One, he didn't do a claim

1    construction either now or in the prosecution history; and

2    two, at the deposition, it's been conceded he said over and

3    over, we cited a bunch of them, we need to know whether air

4    is going to flow through a hole, and when it does I have to

5    do testing.  And he had done no testing on the EdgeVac.  But

6    he offered an opinion as to where the air went and where it

7    was.

8            We brought that motion.  The Court didn't grant

9    that motion.  But it wasn't based on Dr. Stein, our person

10   saying you have to test.  It was based on the fact that

11   Caulfield himself said to do this I need to test.  That was

12   their motion.  That motion was not granted.

13           That is in the past.  At this point in time,

14   both Dr. Caulfield and Dr. Stein have said it is possible to

15   determine -- I don't know if Caulfield said invalidity or

16   not -- but they said you can determine these things without

17   testing.  However, Dr. Stein has explained if you really

18   want to know what is going to happen in the field, you got

19   to test.  It is an additional piece of evidence.

20           We have never taken the position you have to

21   test or don't have to test.

22           THE COURT:  Mr. Boland, how about that?  He says

23   they have not taken that position and they will not take

24   that position in front of the jury.

25           MR. BOLAND:  Your Honor, they argued that

```
 1    Caulfield's opinions were unreliable because they didn't

 2    test.  Our rebuttal to that is with respect to the EdgeVac,

 3    because we had the Kinze documents with their admissions,

 4    there was no need to for the EdgeVac.  With certain

 5    meters --

 6              THE COURT:  I am going to interrupt.  Given Mr.

 7    Durbin's assertion, I am going to deny the motion, and we

 8    will let you test before the jury.  Okay?

 9              MR. BOLAND:  Thank you, Your Honor.

10              THE COURT:  Let's take a stretch break.  And we

11    will come back and deal with the rest of this.

12              (Recess taken.)

13              THE COURT:  All right.  Please, sit, counsel.

14              All right.  So let's go through the matters I

15    have tabbed.  If I skip a page in the proposed -- I am in

16    the proposed order section of your submission -- please,

17    just call me back.  The first point I saw was at Page 7,

18    Paragraph H.  This is under the heading Waivers of Claims

19    and Defenses.  Is there anything here we need to discuss?

20              MR. BOLAND:  Your Honor, this largely derives

21    from us.  Kinze's pleading had laches, waiver/estoppel,

22    unclean hands, and intervening rights.  Those are notice

23    pleadings.  You don't need to go there unless you have

24    inequitable conduct.  Perhaps for unclean hands you do.  We

25    served an interrogatory:  What is the basis for these
```

1    contentions?  They gave the basis for other ones.  They

2    never mentioned any of these specific defenses.  As recently

3    as October, we got a supplementation with interrogatory

4    responses which never mentioned them, either.

5            We don't know what their theories are.  We don't

6    know what the contentions are, and we don't know what the

7    proof is.  We consider them waived.  The first time they

8    came up, when we were negotiating the pretrial order --

9            THE COURT:  Let me help you a little bit.  I

10   think it's fair, so you will know that with which you must

11   contend, but it is a procedural mechanism as described by

12   Kinze to enable me to determine the remaining issues in the

13   case.  In that respect, Mr. Boland, we are in concert, as

14   opposed to providing an additional means for a party, one or

15   the other, to make additional legal argument on the issue of

16   waiver.

17           So, Mr. Durbin, where are we on these?

18           MR. DURBIN:  I believe, Judge, one, that we have

19   properly disclosed them.  Two, we properly answered the

20   interrogatory.  Three, all the facts have already been

21   discovered.  If at trial the Court concludes we haven't

22   presented sufficient facts for the jury to be instructed,

23   the Court will not instruct the jury.

24           THE COURT:  You are saying these claims and

25   defenses, to the extent there are claims, are still alive.

1          MR. DURBIN:  Absolutely, Judge.  They have been

2     alive the whole time.

3          THE COURT:  Intervening rights, obviousness I

4     think is in there, laches.

5          MR. DURBIN:  Yes.  All of those, Judge, all in

6     there.

7          MR. BOLAND:  Your Honor, I would be happy to

8     hand up the interrogatory response.  This is the most recent

9     supplementation, I believe:

10          State the basis for your contentions that the

11     patents in suit are invalid and/or the plaintiffs' causes of

12     action are barred.

13          And looking at the pleadings, we are talking

14     about the, for example, the sixth defense:  Plaintiffs'

15     causes of action are barred by the doctrines of waiver and

16     estoppel.  Barred.

17          I may have handed up the prior response.  But

18     there is another one here, too.

19          For waiver or estoppel, Your Honor, the Court is

20     aware of the law that silence, not suing the day that the

21     patent comes out -- here we sued about a year after the

22     reexam certificates came out.  And Kinze had instituted the

23     reexams.  Some claims were amended and some claims retained

24     their original form and scope, and a bunch of new claims

25     were added.

```
 1              So a year's period of time is not the type of

 2    rebuttable presumption of like six years for laches to kick

 3    in.

 4              For estoppel to apply, there has to be some

 5    affirmative act that we wrote them a nasty letter and said

 6    you are infringing our patents --

 7              THE COURT:  Here is the thing, this is for both

 8    of you.  Mr. Durbin, you and your team correctly point out

 9    the reason for that requirement in my pretrial order.  But

10    the requirement is so that the Court knows, as much as your

11    opponent, your opponent, that which is still at issue.  I

12    don't want to have to contemplate that there are issues that

13    are not being seriously advanced.  So I need to know.

14              MR. DURBIN:  Your Honor, these issues are

15    supported --

16              THE COURT:  If there is going to be evidence

17    adduced on these points, fine.  To the extent that you are

18    doing CYA litigation, excuse me crassness, I don't

19    appreciate it.

20              MR. DURBIN:  Judge, the evidence will show that

21    they knew in 2004, they got on a plane with their lawyers to

22    inspect our device, and sued us in 2008.  During that period

23    of time they were fully aware of what we were doing.  During

24    that period of time we relied on their failure to take any

25    action to continue our efforts to developing the Monosem and
```

1    EdgeVac and marketing.  That is just the beginning of the

2    story.  But that is enough to survive a motion for summary

3    judgment, which is what this is right here.

4              THE COURT:  I am not going to entertain a motion

5    for summary judgment at this point, I made that clear.  I am

6    going to streamline the case to the extent possible.

7              Mr. Boland.

8              MR. BOLAND:  Your Honor, if you look at the

9    answers, none of them mention these defenses.  So they are

10   waived.  There was no fact discovery on it.  None of them

11   are mentioned in any expert reports.  So a lot of times the

12   party puts in some defenses as sort of boilerplate and they

13   fall out of the case.

14             THE COURT:  That is what I meant when I said

15   CYA.

16             MR. BOLAND:  We were shocked to see proposed

17   jury instructions on waiver and estoppel.  What are the

18   facts?  In 2004 -- they came out with their machine in 2005.

19   By that time both patents in suit were engaged in reexams at

20   the Patent Office.  We are not going to sue them based on

21   claims that may be amended --

22             THE COURT:  Mr. Boland, I don't think they are

23   live issues.  I don't think you are going to have to wrestle

24   with them.  We will leave it there.

25             MR. BOLAND:  Under that section, one other point

1    briefly.   There is a 102(g) defense based on this Krause

2    two- hole.   I don't deny that all through discovery we

3    litigated a 102(a) defense based on the two-hole, less than

4    a year before the filing date, was it known or in use.   That

5    was the issue.   Discovery was taken.   A lot of time and

6    money was spent on that issue.

7              On October 22, the Friday night before the MILs

8    were due Monday, October 25th, we get an updated

9    interrogatory which now adds a 102(g) defense for the first

10   time.   We never heard of it.   It wasn't litigated in

11   discovery.   It wasn't in any expert reports.   So on the eve

12   of the motions in limine, there is a brand-new defense.

13             Now, it is not identical to a 102(a) or (b).   If

14   I had known that actual reduction to practice was at issue,

15   my deposition strategy at a minimum would have been

16   different.   They are trying to shoehorn in new defenses at

17   the last minute.   It is similar to this 282 notice.

18             THE COURT:   Let's get a reaction.

19             MR. DURBIN:   Strongly disagree.

20             Let's start with our discovery response, Judge.

21   They asked a question:   If you wade through the whole

22   question and you understand it, you are a step ahead of me.

23   We responded.   We said exactly at the top of our answer:

24   Kinze further objects to this as compound, confusing, and

25   comprising at least three discrete topics to the extent

1    Kinze can discern them.  And we list them.  They are

2    invalidity.  They are all inert defects of the patents,

3    unavailability of the prior art, inequitable conduct.  Very

4    simple.  Based on that understanding, here is all of the

5    information.  Never got a peep from them saying this is

6    about laches and estoppel or waiver, because that is not

7    what this interrogatory asks for.  So we answered it fully.

8             As to 102(g) Judge, we had no idea they were

9    going to come in here again and say there is no evidence,

10   despite Jerome Fink's testimony that this thing was on sale

11   in March of 1996 and it wasn't a sale, it wasn't invented,

12   and it wasn't used to practice.  And we are going to swear

13   behind it.

14            As soon as that came up, we asserted the

15   defense.  It is exactly the way discovery is supposed to

16   work.  We replied in our answer 102.  They knew that.  They

17   took full discovery on all of the issues they have.  Each

18   time some new information came up, we supplemented our

19   answers.  Each time new information came up, we supplemented

20   with a new description of the evidence and the issues.  It

21   is exactly what you are supposed to do throughout discovery.

22            THE COURT:  When did the supplementation occur?

23            MR. DURBIN:  Four months ago.

24            MR. BOLAND:  Your Honor, we served contention

25   interrogatories, as in any standard case, why is the patent

1     invalid, why are our causes of action barred.  I am looking

2     at their fourth, fifth, sixth, seventh defenses, all this

3     waiver and estoppel stuff, barred by the doctrine of

4     intervening rights, barred by the doctrine of laches, barred

5     by waiver and estoppel.

6              We went right to that.  They elected not to give

7     us the facts.  We didn't get the contentions.  Mr. Durbin

8     said, they limited it to certain prior art and inequitable

9     conduct.  We have been litigating Krause and Deere and

10    Monosem.  We have been litigating indefiniteness.  We have

11    been litigating written description --

12             THE COURT:  Let me ask you this:  When you were

13    put on notice as to the 102(g) issue, that was about four

14    months ago?

15             MR. BOLAND:  That was October 22, 2010, Your

16    Honor.

17             THE COURT:  That was subsequent to the close of

18    fact and expert discovery.

19             MR. BOLAND:  Yes, subsequent to the close of

20    fact and expert discovery, and on eve of motions in limine.

21             MR. DURBIN:  First of all, Judge, they were on

22    notice.  We pled 102.  We didn't know how the case was going

23    to shape out.

24             THE COURT:  When did you know you had 102(g)?

25             MR. DURBIN:  We didn't know 102(g) was an issue

1    because the Krause served.

2                    THE COURT:  When was that?

3                    MR. DURBIN:  It was late, Judge.  We thought

4    they were -- we thought they were attacking this in a

5    different way.  But they took a lot of time with Mr. Fink.

6    They got all the facts they needed.  I don't think they can

7    identify a fact they needed that they don't have.

8                    THE COURT:  Why don't you address Mr. Boland's

9    contention that they would have approached their deposition

10   strategy differently.

11                   MR. DURBIN:  I don't know how they could have

12   approached it differently.  The whole time they spent trying

13   to change his testimony about what the document said, which

14   would be the same thing as when it was invented.  I don't

15   know how that would have been any different.

16                   As to expert discovery, it is a factual issue,

17   it will be decided just like we talked about earlier with

18   the Krause two-hole and the support for it.  Those facts

19   will be decided.  Was it invented by August 1995?  The same

20   facts we talked about.

21                   It is in a drawing.  Was it reduced to practice

22   with diligence?  We looked at the invoices.  We looked at

23   the purchase requisitions.  We looked at the tooling and the

24   parts.  The evidence is all the same evidence that would

25   prove the exact same points.

1          MR. BOLAND:  Your Honor, I respectfully disagree

2     with that.  To be clear, they were on notice from a long

3     time ago, particularly when I took Mr. Fink's deposition.

4     They actually took it, I crossed them.  The entire focus of

5     my cross almost was on this two-hole and it wasn't on sale

6     or public use until the time they were claiming surprise.

7     To claim surprise when they didn't know until recently

8     somehow that we were going to raise an attack with the proof

9     as prior art, I just can't agree with that.

10         Our motion in limine attacking it, our No. 1,

11    which you denied today, didn't come till the Monday after we

12    got this Friday 102(g).

13         Second, 102(g), yes, there are some overlapping

14    facts.  I don't deny that.  We are talking about the same

15    sphere of activities.  But the proof of 102(g) involves

16    different considerations.  It is a relative comparison of

17    one party's conception and one party's conception or one

18    party's reduction to practice and the calculus of who was

19    the first inventor.

20         And diligence can then come into play sometimes

21    depending on the competing dates.

22         THE COURT:  Let's wait and see.  If there is a

23    serious 102(g) issue that manifests itself, I will revisit

24    that.  In other words, the old "we will cross the bridge."

25    You have preserved your position.  You will get a chance.

1          MR. BOLAND:  Thanks.  Just to be clear, the

2     other equitable defenses are out.  Laches, estoppel --

3          THE COURT:  No, no.  That wasn't my ruling.

4     What I intended to say is I don't think they are being

5     seriously advanced.  Should that be the case, we will deal

6     with that.  I am not prepared at this point to rule that

7     they have been waived.

8          MR. BOLAND:  At a bare minimum, Your Honor,

9     could we ask that these equitable defenses, such as

10    intervening rights, to the extent they have a case on it, be

11    taken up as part of any Bench trial that the Court might be

12    contemplating?  Because intervening rights is essentially --

13         THE COURT:  I am not inclined to do that at this

14    point, Mr. Boland.  I am not going to go where I am inclined

15    to go.  I am really trying to resist that.

16         Inequitable conduct, I don't have a set

17    practice.  Whoever wrote this statement -- "Case understands

18    that it is my general practice to hold a separate Bench

19    trial," that is not the case.  As Kinze correctly points

20    out, I have done it different ways and don't have a set

21    opinion that one way is better than the other.  I am willing

22    to listen to parties' views as to a particular case and why

23    they do or do not think that a jury acting in an advisory

24    role or the Court holding a separate Bench trial is

25    preferable.

1              Mr. Boland.

2              MR. BOLAND:  Yes, Your Honor.  Thank you.

3              We respectfully ask the Court to keep this issue

4      out from the jury.  The reason is simple.  Claims of

5      inequitable conduct essentially amount to allegations that

6      the inventors, those involved in the prosecution committed a

7      fraud.  That is highly inflammatory.  Your Honor, we submit

8      that the prejudice that would result from trying this

9      subject together with the other issues would severely

10     prejudice our clients in this case.

11             I do think, respectfully, it would be proper for

12     the Court to take into account the merits in determining

13     whether to let it go to the jury or not.  I think that there

14     may well be cases where it's a close call, and the Court

15     might benefit from having some advice from the jury in terms

16     of the Court's ultimate ruling on issue.

17             Here, Your Honor, I am not asking for a summary

18     judgment right now.  But very briefly, we will establish

19     that this Monosem prior art is fundamentally different and

20     not material.  I'm not even sure it is not relevant.

21             Putting that aside, Your Honor, in terms of the

22     pleading that we are faced with, we don't think it even

23     satisfies exigent standards for pleading on intent.  Exigent

24     says, Who?  What?  Where?  When?  What are the specific

25     acts?  There is three people they accuse in the pleading.

1      Mr. Gerasimow from the Case Patent Department and two

2      attorneys who prosecuted the reexamination.

3                  And the two attorneys who prosecuted the

4      reexamination, Your Honor, they never connected their

5      knowledge with Monosem.  Monosem had been filed, a brochure,

6      in one of the two patents in original prosecution.  It was

7      not an issue during the reexaminations and they were not

8      aware -- it was not an issue that was on the table during

9      reexam.  There is absolutely no evidence of intent.  They

10     couldn't have known of its materiality to the claims.

11                 That is a key for intent.

12                 With the other guy, Gerasimow, from the Case

13     Patent Department, they couldn't link him up with any

14     specific knowledge of what was being claimed or even his

15     knowledge of the relevant features of Monosem that they

16     claim are so relevant.

17                 So intent, Your Honor, we submit, is minuscule.

18     There is nothing.  For that reason, on a poorly pled, no

19     evidence case, to let it go to the jury.  Given the dangers

20     of unfair prejudice to our client, we respectfully ask the

21     Court to take it up separately.

22                 MR. DURBIN:  Judge, many of the issues just

23     described by counsel are factual issues that will be raised

24     during the trial.  Monosem is a key piece of invalidating

25     art.  Its functionality and its materiality are going to be

1    addressed in connection with the invalidity proceedings.

2    The question of whether or not it was before the PTO is

3    going to be relevant, to the extent the Court instructs the

4    jury, on due deference to the Patent Office.  It is be part

5    of the standard instruction that is not before the PTO.  The

6    same judgment doesn't apply.  So the issue of what was

7    presented is going to go to the jury.  All of the facts are

8    going to be presented to the jury.

9             It doesn't make sense to me to have two separate

10   trials.  I am not sure how we separate them here.  To me it

11   seems to be the most economically efficient to do it

12   together.  You have these hard issues like intent.  The jury

13   can give their view and Your Honor does not have to accept

14   it, but the jury can provide you with their view of whether

15   there is sufficient evidence of intent.

16             THE COURT:  To what extent would you have to

17   recall witnesses?

18             MR. DURBIN:  I think you would have to recall

19   all the experts.  You would have to recall or play

20   additional portions of various depositions of the inventors,

21   because the inventors -- for example, the issue that was

22   raised about knowledge and intent.  The inventors actually

23   testified that they brought the IP Department, the lawyers,

24   in for a physical viewing of the Monosem in operation.  Most

25   of the same people who then were in charge of setting what

```
 1    prior art was given to the PTO.  That evidence is

 2    interrelated.  Those people are going to testify in the main

 3    case and testify again in the second case, either by

 4    deposition or live.  It is overlapping.

 5              It seems to me the story is so intertwined,

 6    their defense is all about materiality, which goes directly

 7    to what they are going to say on validity.  It is the same

 8    position.

 9              MR. BOLAND:  I respectfully disagree again.

10    There may be some overlap on the relevance of Monosem.  If

11    the Court listens to it in a jury trial, with a view toward

12    taking it up in inequitable conduct on a bench trial, the

13    Court will hear evidence from the experts on the relevancy

14    of Monosem as prior art in general.  But that would only

15    serve to streamline any necessary expert testimony on

16    materiality per se in a separate Bench trial.

17              As to everything else, in terms of intent, I

18    totally disagree with Mr. Durbin.  He mentioned the

19    inventors.  The inventors are not accused.  The attorneys

20    are accused.  I don't see where they would even be called in

21    the jury trial for any other issue.

22              The pleadings are limited to three people.  They

23    are all lawyers.  So any issues of intent, I think that is

24    what would be largely put on.  We would have rebuttal

25    witnesses and so on.  They would be separate.  So we don't
```

1    agree with the characterization.

2              THE COURT:  If the evidence bears out as you

3    suggested it should, Mr. Boland, it seems to me that it will

4    be rather innocuous and not inflammatory at all.  I think a

5    well-instructed jury should be able to deal with the issue.

6    They do it all the time.  I will take an advisory view.  We

7    will do it all at once.

8              The next issue that I think I see is at

9    Paragraph O, Discovery, it is Written Discovery is

10   Substantially Completed.  Is discovery completed or is it

11   not?

12             MR. BOLAND:  I thought it was complete quite

13   some time ago.  What we keep getting is supplementation by

14   Kinze after the close of discovery.  It is largely complete

15   in our book, Your Honor.  I think there is an issue, under

16   the Section O, Kinze is raising some issue regarding

17   inequitable conduct.  I think that's what the first

18   paragraph goes to there.  We are simply saying in the second

19   paragraph that this Section 102(g) is related for the

20   reasons we just argued.

21             THE COURT:  Haven't we sort of already dealt

22   with that?

23             MR. BOLAND:  I think we dealt with Section

24   102(g).

25             THE COURT:  Discovery is complete.

```
 1              MR. DURBIN:  Discovery is complete.  Let me add
 2    one thing, which is that we discovered an error in our
 3    collection of information that has been disclosed to
 4    opposing counsel.  Specifically, it relates to damages.
 5    Apparently at some point in time, we believe that the
 6    EdgeVac meters were not sold independently.  We discovered
 7    recently that in fact a repair code, they created a new code
 8    to sell them independently.  They have supplemented that
 9    information.  We told them we will make our person available
10    for a short deposition if they wish to have it.
11              That is the only open issue we are aware of.  We
12    do have some concerns as raised here about the scope of
13    their discovery responses, but we can take them up at trial
14    as appropriate, where they try to go beyond the scope of
15    their responses.
16              THE COURT:  How will they manifest themselves,
17    those concerns?
18              MR. DURBIN:  I believe if they try to testify to
19    things that they refused to produce during discovery, I
20    would raise an objection, unless the --
21              THE COURT:  Let's see if it becomes a live
22    issue.
23              Do you want to say anything?
24              MR. SCHERLING:  Your Honor, just on the
25    individual meter sales Mr. Durbin was referencing, we are
```

1    reserving the right to object to those.  That is something

2    we can try to address in realtime.  We may take a deposition

3    of Mr. Rikaw (phonetic), we may not.  That is currently an

4    open issue.  We currently don't believe we should.  We

5    believe those documents were produced late and should not

6    even be considered.

7             That is not something that is in the pretrial

8    order.  That happened since the pretrial order was

9    submitted.  They produced these documents nearly six months

10   after the close of discovery, four months after experts.  We

11   think it's late.  We will try to work that out with Mr.

12   Durbin in the meantime, and bring it to you if necessary.

13             THE COURT:  That is fine.

14             Q, Page 16, Case indicates it plans to move,

15   failure to state a claim before trial by a motion for

16   judgment on the pleadings under 12(h)(2).  I am not going to

17   entertain any such motion.

18             Bifurcation, we will not bifurcate willfulness

19   and damages, that's in Paragraph R, as Kinze requests.

20             Opinions of counsel.  This is at Subparagraph

21   R(a), objections to testimony -- let me say this about

22   designations.  I don't do deposition designations,

23   objections.  You will work them out.  Otherwise, it won't

24   come in.  It is as simple as that.

25             All objections to all exhibits are overruled

1    without prejudice to your ability to raise them again.

2    Therefore, everything is in.  It's been made a part of this

3    pretrial order.  It's in.  Please do not take up my time and

4    my jury's time by attempting to move these matters

5    individually.  They are in.

6              So there is a Kinze opinion of counsel defense.

7    Is this something we need to discuss?

8              MR. DURBIN:  It was an objection we raised in

9    response to certain deposition designations and exhibits

10   that were being offered.  It was a question of, the

11   plaintiffs attempted to introduce evidence of our potential

12   assertion of the opinion of counsel defense in their

13   case-in-chief.  We said, we may or may not do that.  It is

14   up to us, not you.

15             MR. SALIBA:  Just this clarification.  Kinze

16   objects to the use of exhibits referring to the opinions of

17   counsel.

18             (Addressing Mr. Durbin)  Are you referring to

19   the opinions of counsel that you waived and all the

20   privileged documents attendant thereto, or the point that --

21   the actual letter in which you produced those exhibits?

22             MR. DURBIN:  My view, Your Honor, if they

23   introduced the opinion letter, they have introduced my

24   opinion of counsel defense.  And I have no choice but to

25   assert it and deal with it.  I don't think there will be any

```
 1    such objective evidence of invalidity here.  We may never

 2    need to deal with that issue.  If they introduce Mr. Hill's

 3    opinion, now I have got to call Mr. Hill, I have got to

 4    address it.  It's my bell to ring because it is my defense.

 5    It is not relevant to prove infringement or invalidity that

 6    he gave an opinion.

 7               THE COURT:  It is not your contention that the

 8    defense being asserted, the privilege having been waived,

 9    that the opinion letter somehow couldn't come into evidence.

10               MR. DURBIN:  Non-privileged?

11               THE COURT:  Couldn't come into evidence.

12               If we assert the defense, it should come into

13    evidence.

14               MR. HORWITZ:  Your Honor, I think the point is,

15    if we don't raise it as a defense --

16               THE COURT:  I got the point.

17               MR. BOLAND:  Your Honor, we are probably not

18    going to put the opinions in our case.

19               THE COURT:  I wouldn't see why.  But go ahead.

20               MR. BOLAND:  We are not going to do that.  But

21    there is a lot of related things.  We have got a whole bunch

22    of discovery, a broad waiver.  So we got things involving

23    this Mr. Hill that aren't the opinion letters per se.  Our

24    contention is, a lot of them show serious concerns about

25    these patents before and after the opinions were given and
```

1    before and after reexam and during reexam.  And there is

2    internal Kinze documents.  We are going to use that in our

3    case-in-chief to show willfulness.  If they want to come

4    back and rely on the opinions, we will deal with the

5    opinions.  That is the plan.  I don't see how that could be

6    objectionable.

7              MR. DURBIN:  I think that actually relates to a

8    separate issue we did raise, which was, a lot of those

9    documents relate to the prosecution of our own patent.  In

10   our view -- yes, we have two of our own patents --

11             THE COURT:  They are not in contention?

12             MR. BOLAND:  No.  But they are trying to prove

13   that our patents infringe their patents.  Since our patents

14   embody our products, they must infringe their patents.  Our

15   point is, that is silly.  You need just prove that our

16   products, if you can, the accused device, infringes your

17   patent, and introducing the patent just causes confusion.

18   And a lot of these products led to the patent application

19   process --

20             THE COURT:  It is the accused product to claim.

21             MR. DURBIN:  Right.  That was our objection.

22             MR. BOLAND:  Your Honor, we are going to rely --

23   like Dr. Caulfield did in his PI as I explained before,

24   there is Kinze patents that we are not saying infringe our

25   patents.  We are going to use them as evidence of what the

1    EdgeVac is and does.  There is no doubt that Kinze marks its

2    EdgeVac product with this patent number.  And there is no

3    doubt that the patent has very relevant information in it

4    about how the meter works.  That should be wholly

5    admissible.  It is relevant.  They are entitled to cross on

6    it.

7                 THE COURT:  Mr. Durbin, any difficulty with

8    that?

9                 MR. DURBIN:  It clearly confuses the issue.  The

10   way the testimony went was they sat an inventor down --

11                THE COURT:  Let's anticipate how the testimony

12   is going to go.

13                MR. DURBIN:  Much of it is deposition, so we

14   know how it's going to go.  What they did is put a person

15   down, had the person --

16                THE COURT:  Let me ask you this, to get you to

17   react to Mr. Boland's comment.  I won't assume that is

18   exclusive use, but maybe it is, to show how the device

19   works, for instance, the accused product works.

20                MR. DURBIN:  I think that the problem with it is

21   that the patents in issue don't claim anything related to

22   the patents, don't use any of the same words.  So it will

23   confuse the jury.

24                THE COURT:  If it, in your view, as the evidence

25   is developing -- and I want to urge you as well, Mr. Boland,

1    we don't want to confuse the jury, it is not in anybody's

2    interest to do that.

3              MR. BOLAND:  We don't to confuse the jury.

4              THE COURT:  We don't want to be back here doing

5    this again.

6              MR. BOLAND:  We have an obligation to prove the

7    structure and function of the product.

8              THE COURT:  My only point is to the extent --

9    you know, the Federal Rules of Evidence are very liberal.

10   They are rules of inclusion, really, not exclusion.  I am

11   loathe to exclude, unless we are going to run the risk of

12   confusion or, obviously, if unreliable testimony is coming

13   in.  So I am going to be very attentive to objections.

14             Let me tell you both that I really try to keep

15   at arm's-length from the management of your cases.  But

16   where I see a risk of confusion, I will jump in sua sponte.

17             Go ahead.

18             MR. BOLAND:  We understand.  We are planning to

19   use this evidence in a straightforward manner, to help show

20   our case of infringement, Your Honor.  That is all.  I don't

21   see any risk of confusion.

22             THE COURT:  I don't see a difficulty with that.

23   If you do, Mr. Durbin, you will raise it.

24             MR. DURBIN:  Correct, Judge.

25             MR. HORWITZ:  Your Honor, I think with the

1    exchange that we have in place in the order to get exhibits

2    that they are going to use with specific witnesses, if we

3    see something that we think might raise an issue, we will

4    raise it with them and try to head it off.

5              THE COURT:  Which also raises the ministerial

6    point, and I expect that most mornings you will have issues

7    that you want to discuss with me.  So we will meet at 8:30,

8    and we will talk about them.  To the extent we need to talk

9    about them at the end of the day, the jury leaves at 4:30,

10   and you can anticipate issues that may be contentious, we

11   can talk about it at 4:30 of that same day, obviously, in

12   addition to other opportunities.

13             I want to urge you to try to keep requests for

14   sidebars to a minimum.  Juries don't like them, they really

15   don't.

16             All right.  Let's see now.  Lay testimony.  Is

17   there an issue?

18             MR. DURBIN:  That was one of our objections.  It

19   is pretty specific.  There are a handful of folks who were

20   asked questions using claim terms that we don't think there

21   was an adequate foundation laid for it.  Specifically, Mr.

22   Tony Bakker is the president of a company that sells Monosem

23   meters.  A series of questions were asked him whether

24   certain aspects of the device had anything to do with,

25   quote, release of seeds from the disk.  That is language in

1   the patent at issue here.   No foundation he has ever even

2   read the patents.   He answered a series of questions saying

3   yes or no to those.   We believe that is essentially lay

4   expert testimony without proper foundation and should be

5   excluded.

6            MR. BOLAND:   Your Honor, among the third-party

7   witnesses who were deposed here, we have Mr. Lundie from

8   Deere, that Mr. Durbin deposed and I was there.   Mr. Fink

9   from this Krause Company, that Mr. Moore deposed and I was

10  there.   We have Mr. Bakker from Monosem that Mr. Moore

11  deposed and I was there.   And I crossed them all.

12           In multiple instances, the Kinze lawyers

13  elicited testimony from these third-party witnesses as to

14  how their meters worked, not just the structure, but would

15  they exist in this part of the meter.   With one exception,

16  they are putting in all that testimony.   It is not just

17  limited to the structure and it's not just limited to the

18  date.   It's how the whole thing works.   And the witnesses

19  have personal knowledge of it.

20           We are not trying to strike all their evidence

21  and block all testimony on functionality.

22           But when I crossed Bakker and this whole Monosem

23  meter that the Court will see at trial, it's got these

24  openings that are way up here and the seed is outside and

25  Mr. Bakker was telling me that these openings that Kinze

1    says are so critical, he told me they have nothing to do

2    with the key issue in the case.  So they don't like that and

3    they want it out.

4         If that's out because there is some general rule

5    that a third-party witness can't testify about how the meter

6    works based on firsthand knowledge, that should apply across

7    the board.  To simply say, you know, the key testimony that

8    we got that now would be critical for the jury to hear as to

9    why there is no inequitable conduct and how different this

10   meter is and how Kinze's defense on Monosem misunderstands

11   the entire structure and functioning of the device, that

12   would severely prejudice us.

13        At a minimum, there should be one rule.  Either

14   no third-party witness can talk about how the meter works

15   despite the fact that he or she has firsthand knowledge of

16   it or not.  But to single out the cross I got from Bakker

17   and say that's inadmissible but everything we want should

18   come in, Your Honor, that is totally unfair.

19        MR. DURBIN:  Judge, I would say we will look at

20   our designations.  We might be okay with Rule No. 1.  We

21   don't think we designated a lot of function.  What we didn't

22   do was use claim terms and ask the witness to opine on these

23   claim terms.  The jury will have no idea that Mr. Bakker --

24        THE COURT:  Mr. Boland would concede, that is a

25   difference.  Right?

1            MR. BOLAND:  I didn't have the patents.  I

2    wasn't showing him the patents.  I wasn't asking him about

3    claim construction.

4            But that is language in the patents --

5            THE COURT:  But they are not experts.  Why would

6    you need to reference claim terms?

7            MR. BOLAND:  How else can you say it, Your

8    Honor, it is the plain and ordinary meaning of the --

9            THE COURT:  You talked about functionality.

10   Just say, how does the thing work?

11           MR. BOLAND:  That's what I thought I did, Your

12   Honor.

13           THE COURT:  Look, work it out.  It really sounds

14   to me like more of an issue of form rather than substance.

15   I don't want to raise form over substance.  Just see what

16   you can come up with.

17           Opening statements, you want me to confirm it is

18   my practice not to permit use of depositions.  I don't know

19   where these things are coming from.  Why do you need to use

20   these depositions?  Who wants to use deposition testimony?

21           MR. BOLAND:  Not me.

22           MR. DURBIN:  No.

23           THE COURT:  It's a nonissue.

24           My preference with regard to juror notebooks is

25   simple.  Each side should prepare 12 copies of the notebook

1    you want to have in the jury's hands.  That is limited to

2    exhibits that you want to to become facile with.  You are

3    going to be flashing a lot of things on the presentation

4    equipment.  Obviously, you can't give them all of that in

5    the notebook.

6              But there must be certain exhibits that you want

7    them to be able to make notes on, to really understand well,

8    obviously, that are admitted and not objected to, that have

9    been discussed with one another.

10             So that is what a jury notebook in my Court

11    looks like.  And they are handed out by Ms. Walker at the

12    beginning of your case-in-chief.  And that's it.

13             With regard to witness notebooks, usually,

14    lawyers in cases of this type, complex civil cases, prepare

15    both direct and cross binders for the witnesses.  And I

16    typically like to have one for me and one for my clerk, my

17    law clerk, and in addition, obviously, to opposing counsel

18    and the witness.

19             MR. DURBIN:  Can I ask for one clarification?

20             THE COURT:  Sure.

21             MR. DURBIN:  At the beginning of the Plaintiffs'

22    case-in-chief, the only notebook that will be given will be

23    the Plaintiffs' notebook?

24             THE COURT:  Yes.

25             MR. DURBIN:  Just to be clear.  Thank you.

1           THE COURT:  I have ruled on objections to the

2      exhibits interposed by both parties.  I have discussed

3      deposition designations.

4           Let me suggest to you, counsel, with regard to

5      the preliminary instructions, in our most recent patent

6      case, I forget which one it was, it was nicely done, the way

7      counsel interposed the introduction of the video.  I would

8      commend the video to you.  Is there objection to it?

9           MR. BOLAND:  We are okay with the video.

10          MR. DURBIN:  Agree, Judge.

11          THE COURT:  That is what I would suggest

12     provides better general guidance regarding patents for

13     juries than that which is suggested in your proposed

14     preliminary jury instructions.  In Grape Technology, we just

15     finished that case, and they did a nice job of composing

16     language.

17          MR. BOLAND:  Your Honor, if we are going to use

18     the video, and we would agree to it, if we can have an

19     opportunity to perhaps tweak a couple other paragraphs of

20     the proposal we gave Your Honor and come back with our final

21     proposed --

22          THE COURT:  Yes.

23          MR. DURBIN:  I think we can take a look at it.

24     Your proposal is maybe scrap this whole preliminary and just

25     play the video.

1              THE COURT:  Scrap this part of the preliminary

2    that deals with guidance, not the whole preliminary

3    instructions.

4              MR. COTTRELL:  Your Honor, if I may, while we

5    are on preliminary instructions, I talked to Mr. Horwitz

6    about this, we noticed that the Court adopted an electronic

7    media --

8              THE COURT:  Social media.  I would like you to

9    add that language.

10              MR. COTTRELL:  We will do that.

11              THE COURT:  It is in the Grape -- it's on the

12    website now.

13              MR. COTTRELL:  It is, Your Honor.  Thank you.

14              THE COURT:  Thank you, Mr. Cottrell.

15              Let's go quickly to voir dire.

16              In the main, the questions are fine.  Here are

17    the five that I am intending to strike, absent somebody

18    really getting heartburn and convincing me otherwise.

19              We are at Tab 18.  No. 18 proposes to have me

20    inquire, have you or any member of your immediate family

21    ever had education or experience in engineering, farming, as

22    a mechanic or in any other technical field?

23              The basic premise that I operate under in terms

24    of selecting a jury is this:  Can the juror sit fairly and

25    impartially and judge the facts?  Not whether they have an

1    engineering degree, a law degree, whether they are

2    homemakers, registered nurses, technicians.  Whatever the

3    case may be.  So if you can tell me how a background in

4    engineering, farming, or as a mechanic or other technical

5    field may or may not inform that person's ability to sit and

6    be fair, and therefore it needs to be inquired, I am willing

7    to hear.

8           MR. DURBIN:  Your Honor, I think specifically

9    with respect to farming, what we might find is there are

10   some people who are very familiar with one brand or one part

11   of the other, one type of mechanism, something that is

12   specifically in this case, and already has a predisposition.

13   If we don't ask the question, we won't every know.

14           I imagine there is a good chance that everybody

15   who is in farming would say no.  But some people might say

16   yes and that might be brought into it.

17           THE COURT:  Do you concur in that?

18           MR. BOLAND:  Yes, in general, Your Honor.

19   Because I think here one issue will be is if a juror is a

20   farmer, farmers often have very strong brand loyalty.

21   Either they are a Deere person or a Case person or something

22   else.  But I am looking at 14, and that sort of picks up the

23   farming.

24           THE COURT:  I will make both inquiries.  I was

25   intending to ask 14.  That is, have you or any member of

1    your immediate family ever owned or used farm equipment.

2    But I will inquire have you or any member of your immediate

3    family ever had an educational experience in farming.

4              MR. DURBIN:   Thank you, Judge.

5              I am not going to ask about law degrees or other

6    legal training.  That is No. 19.  That is going to be

7    apparent from the information you will get prior to jury

8    selection.  It will be available the Wednesday before trial.

9    But you can get it, and you will from Ms. Walker get it on

10   the morning of, because that will be the most recent list

11   that will have really minimal information.  It will have

12   name.  It will have the section of the state from which the

13   person hails.  Usually, it has occupation, I think marital

14   status, and age on there as well.

15             No. 23, I don't intend to ask, nor do I intend

16   to ask No. 24.

17             I think 21 sort of picks up No. 24, 21 being

18   have you or anyone in your immediate family ever applied for

19   or obtained a patent in the U.S. or abroad.  We could add to

20   that -- it says "applied for or obtained."  You get a yes,

21   you will get a chance to follow up at sidebar with me.  On

22   all of these questions to which a putative jury has answered

23   a general yes, we will call up after I do the general

24   questions and we will rotate.  And you will get a chance to

25   interpose additional interrogatories on the record.

1              While I am on that, we will entertain cause

2       motions at that time.  Not in front of the juror.  We will

3       invite the juror to go back.  I will ask for cause, and I

4       will rule.

5              In all likelihood there will be a number of

6       occasions where I will sua sponte dismiss the jury for

7       cause.  I will give a chance to object.  It usually comes up

8       in a situation where there is a child care issue, someone is

9       self-employed, just got a job, is going to miss a final

10      exam, that kind of thing.  And in this economy, I have found

11      that I have been required to act more frequently on causes

12      for economic reasons than I used to earlier in my clear.

13             Do we have this on disk?

14             MR. BOLAND:  We can easily submit it.

15             THE COURT:  Go ahead and submit it.  I am going

16      to reposition 25 to follow No. 20.  Do you hold any opinions

17      about the U.S. PTO, to follow the Question No. 20, that

18      patent applications are examined --

19             No. 29 will be taken up in another question.

20      No. 29 is have you or any immediate member of your family

21      ever been involved in a patent dispute?  I am going to ask

22      them about litigation generally and involvement in

23      litigation.  I think that will cover that.

24             Other than that, the questions are fine, other

25      than those.

1            So a few additional things.

2            Counsel, when you have occasion to object,

3    please rise, state your objection by referencing the

4    substantive reason for which you are objecting, rather than

5    the rule number.  Don't argue the objection.  I endeavor to

6    rule promptly.  If I don't, I will call you to sidebar

7    myself.  If I have ruled, and you strongly disagree with it,

8    and you want to make your record, get me is to sidebar.  Not

9    always easy.  But you got to get me to sidebar.  It's your

10    job.  I usually go.

11            We turn on the white-noise machine.  I try not

12    to yell above it.  That is the way things go around here.

13            Approaching a witness, just ask one time,

14    please, on each witness.  Then you have free leave.  You are

15    automatically given free leave.  Just keep going back and

16    forth as much as you need to.

17            Moving around the courtroom, it is a U.S.

18    courtroom.  I expect your conduct to be very formal.  I am

19    very formal, unlike sometimes I have been here today, I sort

20    of morph into a different person when I don the black robe.

21    It is not "black robe disease."  It is simply a requirement

22    that lawyers conduct themselves in my view in an appropriate

23    way in a United States courtroom.

24            When you want to move about, ask for permission.

25    This is not the "wild west" of my colleagues -- and they

1    will get on me -- on the Bankruptcy Court across the way.

2    We used to do first-days here.

3                In any event, they do a great job.  We have

4    great bankruptcy judges in this district.

5                MR. DURBIN:  May I raise a question?

6                THE COURT:  Yes.

7                MR. DURBIN:  We put in the pretrial order that

8    for dividing time we should assume six hours a day.  Mr.

9    Horwitz has told me that is not always --

10               THE COURT:  The multiplier I strive for, the

11   time I strive for is six, but the multiplier should be five

12   and a half, because what happens is, inevitably, it is

13   usually my fault, we end up running over a little bit on the

14   breaks.  Just by loose calculation I think it comes down to

15   five and a half.  I do try to adhere to the 15 minutes that

16   I allot in the morning and in the afternoon.  But I think it

17   really comes out to more like five and a half.  We will

18   divide it evenly, unless there is some reason that one of

19   you thinks it shouldn't be divided evenly.

20               THE COURT:  Is there any problem with that?

21               MR. BOLAND:  That is fine, Your Honor.

22               THE COURT:  You will keep one another's time,

23   please.  You are the best timekeepers that I have.  Ms.

24   Walker will back you up.  We should do time checks

25   periodically.  I will rely on Delaware counsel in that

 1    regard, if there is an issue that is arising.  Please don't

 2    lose track of your time.  Fortunately, it has only happened

 3    once.  But it did happen in a patent matter where a

 4    plaintiff ran out of time, because I enforce it rigorously,

 5    they couldn't make certain proofs by way of evidentiary

 6    presentation that they needed to make.  It shouldn't happen.

 7    You guys are too experienced and too good at what you do to

 8    let that happen.

 9            MR. DURBIN:  May I, Judge?

10            Despise my wise local counsel's direction not to

11    do so, I am going to ask if there is any opportunity for us

12    to have additional time.

13            THE COURT:  No.  And he was very wise in that

14    regard.

15            You may be interested to know that we, in 2010,

16    this Court assumed in the country the number-one per Judge,

17    that was on four Judges, we have now ended our fourth year

18    with three Judges and now one Magistrate-Judge, and we are

19    No. 2 in terms of gross filings.  So I don't have additional

20    time, I just don't have it.

21            I don't see on the horizon a quick resolution,

22    quite frankly, to the filling of our vacation.

23            My wise Chief Deputy says settlement.  It may be

24    the case, and I do usually inquire as to whether there have

25    been additional discussions or whether they are ongoing.

```
 1              MR. BOLAND:  Your Honor, as a matter of fact,

 2    right before the holidays, CNH made a concrete demand to

 3    Kinze to try to settle the case.  But we haven't heard back.

 4    We asked for a response by today so we would perhaps be in a

 5    position to say something to Your Honor that there might be

 6    some light or not.  But we didn't hear back.

 7              THE COURT:  Mr. Durbin.

 8              MR. DURBIN:  We would love to talk about

 9    settlement.  That was a starter.  Perhaps we could have some

10    continued conversations outside the courtroom.

11              THE COURT:  You are saying the demand --

12              MR. DURBIN:  It was more of a demand for

13    judgment, from our perspective.

14              THE COURT:  Obviously, counsel, you are

15    sophisticated lawyers.  You know you can talk on your own.

16    You have got sophisticated businesspeople on either side of

17    the issue.  Have the businesspeople been speaking to one

18    another?

19              MR. DURBIN:  No, Judge.

20              MR. BOLAND:  I would like it.  I think we would

21    both like it to come to that, if there is some areas that

22    would be worthwhile.  So we have an open mind, Your Honor.

23    As in any case, our client feels that it's reasonable.

24              THE COURT:  I will say this to the in-house

25    folks who are here.  I have been doing this now more than 12
```

1    years, and have seen over that time rather good results

2    when, with all due respect to outside counsel,

3    businesspeople have been left to their own devices, without

4    the aid and benefit of lawyers.  This is not in any way to

5    diminish the value that lawyers bring to this process.

6           But it has been my experience on more than one

7    occasion, particularly when I have worn the hat of neutral

8    which I do from time to time -- I am not offering that in

9    this case -- where people who really understand their

10   business much better than any neutral can, much better than

11   the best outside counsel can, get together in a room and

12   hash it out.  Just a thought.

13          I think that exhausts my list of issues.  Mr.

14   Boland.

15          MR. BOLAND:  I think one minor issue, Your

16   Honor.  Perhaps Mr. Scherling can raise it.  It is regarding

17   access under the productive order for Ms. Lawrence.

18          MR. SCHERLING:  Ms. Emily Lawrence is in the

19   courtroom today.  She has been observing for Case today.  We

20   have been trying to work this out with opposing counsel --

21   so far we haven't been able to -- to allow Ms. Lawrence to

22   have access to highly confidential material under the

23   protective order that so far is attorneys' eyes only.  We

24   would request that Ms. Lawrence be allowed to see such

25   highly confidential Kinze materials.

1                   She is a managing attorney for litigation.  She

2       is new in the position.  She is managing attorney for

3       litigation.  She is not involved in any patent prosecution

4       per case.  She doesn't work with the engineers.  She is not

5       involved in product development or intellectual property.

6       She oversees litigation.  That is her job, to oversee the

7       litigation, work with us, and report to supervisors or her

8       superiors as appropriate.

9                   She is not in any way involved in what is a

10      touchstone frequently for in-house counsel having access to

11      highly confidential materials, which is competitive

12      decision-making.  She is not involved in that kind of stuff,

13      no patent prosecuting marketing, business, not that type of

14      thing.

15                  THE COURT:  She has no business clients in the

16      company?

17                  MR. SCHERLING:  Correct.  She does not work with

18      patent prosecutors, marketing, advice on business

19      initiatives, things like that.

20                  THE COURT:  I ask because I used to wear a duly

21      hat when I was at Hercules.  I would manage some litigation,

22      but I was also involved in giving business advice for a set

23      list of in-house clients that I had.

24                  MR. SCHERLING:  Her job is managing attorneys

25      for litigation.  She is in a separate building from

1    engineers, a separate building from marketing.  She is in a

2    different country from where the planters are made.  They

3    are actually manufactured in Canada.

4              She would keep the information on her own laptop

5    computer, not own a server that is common with anyone else.

6    Any copies would be locked up.

7              THE COURT:  What about conferring with general

8    counsel, her boss?

9              MR. SCHERLING:  Her boss, her immediate boss is

10   a man named Mr. Conrack (phonetic).  He is also not directly

11   responsible for any competitive decision making.

12             THE COURT:  Is he the GC?

13             MR. SCHERLING:  He is not the GC.  They have a

14   GC above him.

15             THE COURT:  She must have at least a dotted line

16   to the GC.

17             MR. SCHERLING:  She has a dotted line to the GC.

18   He has temporarily overall responsibility for things that do

19   involve the IP group.  But he is not actively involved on a

20   day-to-day basis, as I understand.  Importantly here, Ms.

21   Lawrence would be where the access ends.  She has actually

22   signed the acknowledgment under the protective order.  It

23   would just be for her to see it.  She might advise, for

24   example, Mr. Conrack, for example, or the GC, Mr. Goyne

25   (phonetic), as to roughly the status of the case, here is

1     what is going on, Kinze has made a settlement offer,

2     whatever.  Here is how I assess the case.  But without

3     giving the highly confidential information.

4              It is important for her to be able to do that to

5     relate to the company.  And also, she is going to be

6     involved in helping us prepare for trial.  It is important

7     in that respect because she is managing a tray for

8     litigation.  It is a big enough company.  We have people

9     that do that.

10             THE COURT:  Sure.  I worked for a company that

11    size, probably bigger at the time, who had that function.

12             MR. DURBIN:  We proposed a couple things here.

13    We said, can you tell us exactly what it is she needs to see

14    so we can look at it, and propose some kind of mutuality,

15    because we don't have anybody we can talk to on highly

16    confidential information.  They haven't been willing to do

17    either of those.

18             My concern with Ms. Lawrence is, you hit on it,

19    which is that the information, she was asked, they asked

20    whether she could have the information so she could then

21    understand what it is and report to management.  Those same

22    management people, I remember one of them, Mr. Goyne, he is

23    one of the people that decided to sue us.  He is the kind of

24    people that make the kind of competitive situations that are

25    at issue here.

1         If the fact of the matter is not a peep of what

2    she learns will go to those people, they already have people

3    that can manage that.  We have shared information with the

4    entire team here.  They can summarize expert reports and

5    damage information without disclosing confidential

6    information to the decision-makers.  It sounds like Ms.

7    Lawrence is not the decision-maker.  The question is why do

8    we need to share our information with one more person?  If

9    she is not going to share it, she just creates a risk for

10   us.

11         THE COURT:  Here is what I have heard, one of

12   the last statements I heard was to assist in the preparation

13   of the case.  It would have to be under circumstances where

14   she is not going to share.

15         Your reaction?

16         MR. DURBIN:  Then if she is not going to be

17   advising management based on what she learns, which I

18   thought she would do, what I would ask for is a list of the

19   kind of things she wants.  There is a list of stuff there is

20   no reason for her to see.  There is not lost profits in this

21   case.  There is a ton of information that she could share,

22   that I don't know why she would need access to it.  It

23   wouldn't be relevant.

24         I am not sure what they want to show her.

25         MR. SCHERLING:  Your Honor, we think under the

1    circumstances where she signed the acknowledgment, she would

2    be giving her word that nothing would be bleeding past her,

3    no highly confidential information going past here, she

4    should be entitled to see everything, including Kinze's

5    financial information.  That is very pertinent to Case, even

6    though not lost profits, it goes to the number of units

7    sold, the revenue they generated, their profits.  That is

8    important to assess that information independently.  We

9    certainly are advising them.  It is her job to manage

10   litigation.  For her to be able to do that, I think she

11   needs access to that information.

12            MR. DURBIN:  I don't see how they are being

13   handicapped in any way.  We don't have anybody like that.

14            THE COURT:  You just happen not to be structured

15   that way.  I guess, having been there, it sort of resonates

16   with me that the client would want to have someone from

17   within its own ranks, someone with whom they have

18   implicit -- not that they don't trust their outside counsel

19   implicitly -- but have a different or at least an even

20   stronger relationship, for lack of a better word.

21            I can't think of something appropriate to say,

22   why, given the constraints of her ability to share, in any

23   way risks prejudice to Kinze's competitive position.

24            I am going to permit her to have the access.

25   But it must not go beyond, and it must be for purposes of

1      assisting in the preparation of this case.

2                      MR. SCHERLING:  Thank you, Your Honor.

3                      MR. BOLAND:  Plaintiffs have no more issues.

4                      THE COURT:  Mr. Durbin.

5                      MR. DURBIN:  No, Judge.

6                      THE COURT:  All right, counsel.  Thanks for your

7      time.  We will see you along the way.

8                      (Concluded at 12:45 p.m.)

9                              -   -   -

10     Reporter:  Kevin Maurer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25